# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### BRYSON CITY DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **vs.** ) | |
| ) | **CASE NO. 2:13-CR-15-MR-DLH** |
| **JEROME BROCK PARKER (1)** ) | |
| **JERRY FRANCIS PARKER (2)** ) | |
| ) | |
| _____) | |

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **vs.** ) | |
| ) | **CASE NO. 2:13-CR-16-MR-DLH** |
| **DAVID CHADWICK CRISP (1)** ) | |
| **DAVID FRANK CRISP (2)** ) | |
| **ROBERT WILLIE BUMGARNER (5)** ) | |
| ) | |
| _____) | |

## MEMORANDUM DECISION
## AND ORDER

**THESE MATTERS** are before the Court on the above-named defendants' motions to dismiss the Indictments in their respective cases for lack of subject matter jurisdiction [CR-15 Docs. 77, 80; CR-16 Docs. 77, 78, 86, 99, 100, and 103].[1]  Further, the defendants have filed motions to

_____

[1] Citations to the record contain the relevant docket (i.e. CR-15 or CR-16) and document number.

dismiss the Indictments due to constitutional due process violations [CR-15 92, 93; CR-16 Docs. 98, 102, 104], and four[2] defendants have moved the Court to dismiss the Indictments based on entrapment. [CR-15 Docs. 92, 93; CR-16 Docs. 98, 102]. Even though these cases were indicted independently, they originate from the same undercover investigation. More importantly, however, the legal analysis necessary to resolve the motions pending in both cases overlaps to such an extent that the Court finds it more efficient to set forth its reasoning in this comprehensive memorandum, filed in both cases.

## PROCEDURAL BACKGROUND IN CR-15

Defendants Jerome Brock Parker ("Jerome Parker") and Jerry Francis Parker ("Jerry Parker"), together with Carl Wesley Junaluska II,[3] Walter Henry Stancil,[4] and Walter Cale Stancil,[5] were named in a two-count Indictment returned by the grand jury in this District on June 4, 2013. [CR-15 Doc. 1]. Jerome Parker, Jerry Parker, and the three other men were

---

[2] Only CR-15 Defendants Jerome Brock Parker and Jerry Francis Parker, and CR-16 Defendants David Frank Crisp and Robert Willie Bumgarner have filed motions to dismiss based upon entrapment.

[3] Defendant Junaluska was dismissed from this matter November 21, 2013. [CR-15 Doc. 73].

[4] Defendant Walter Henry Stancil has neither entered a guilty plea in this matter nor joined in any of the dispositive motions discussed herein.

[5] Defendant Walter Cale Stancil was dismissed from this matter February 25, 2014. [CR-15 Doc. 87].

charged in Count One with a two-object conspiracy to violate wildlife laws and regulations in derogation of 18 U.S.C. § 371. The grand jury alleged that from October 24, 2011, to October 28, 2011, in two separate incidents, the defendants conspired to sell, acquire, receive, and transport American black bear, with a market value in excess of $350, by providing guiding services for money and other consideration, knowing the bear to have been taken, possessed, transported, and sold in violation of federal law, and of state law by assimilation. [Id. at 1-5]. Count Two alleged the defendants should be punished federally, pursuant to 16 U.S.C. § 3372(a)(1),[6] for illegally taking wildlife on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13. [Id. at 5-6].

Defendants were arraigned on June 17, 2013, and entered pleas of not guilty to both counts. Following their arraignments, defendants were released under pretrial supervision upon stated conditions. [CR-15 Docs. 8; 10]. On December 4, 2013, in nearly identical motions and memoranda, the Parkers moved the Court to dismiss the Indictment filed against them based upon the alleged want of subject matter jurisdiction. [CR-15 Docs.

---

[6] The Lacey Act, 16 U.S.C. § 3371 et seq., is a collection of statutes that imposes federal penalties for certain violations of state fish and wildlife laws and regulations. United States v. Dove, 247 F.3d 152, 156 (4th Cir. 2001).

77-81]. The Government responded by filing its Memorandum in Opposition together with exhibits. [CR-15 Docs. 82; 83]. The Court heard arguments from counsel for all parties on March 24, 2014, regarding defendants' dismissal motions. At the conclusion of the hearing, the Court ordered additional briefing on the issue of the Court's subject matter jurisdiction. On March 28, 2014, Defendant Jerry Parker filed a Motion to Dismiss for Entrapment and Due Process Violations [CR-15 Doc. 92] and a brief supplementing his Motion to Dismiss for Lack of Jurisdiction. [CR-15 Doc. 92-1]. On that same day, Defendant Jerome Parker filed a Motion to Dismiss for Entrapment and Due Process Violations [CR-15 Doc. 93] and a brief supplementing his Motion to Dismiss for Lack of Jurisdiction. [CR-15 Doc. 94]. The Government responded with separate memoranda filed April 3, 2014, and April 18, 2014. [CR-15 Docs. 95; 96]. The Court conducted a second hearing on the defendants' motions on May 29, 2014.

## PROCEDURAL BACKGROUND IN CR-16

Defendants David Chadwick Crisp ("D.C. Crisp") and David Frank Crisp ("D.F. Crisp"), Robert Willie Bumgarner ("Bumgarner"), together with Tommy Gene Queen,[7] and Mitchell Allen Jenkins,[8] were named in various

---

[7] Pursuant to a written plea agreement [CR-16 Doc. 74], Defendant Queen entered a plea of guilty to Count 3 of the Indictment on December 4, 2013, and, consequently, is not a party to any of the dispositive motions discussed herein.

counts of an Indictment returned by the grand jury in this District on June 4, 2013. [CR-16 Doc. 1]. D.C. Crisp, D.F. Crisp, Bumgarner, and the other two men were charged in Count One with an 18 U.S.C. § 371 conspiracy to violate wildlife laws and regulations. The grand jury alleged that from November 17, 2010, to December 13, 2011, the five defendants conspired to sell, acquire, receive, and transport American black bear and white tail deer, with a market value in excess of $350, knowing said wildlife was taken, possessed, and transported in violation of federal law, and of state law by assimilation. [Id. at 1-2]. Count Two alleged a Lacey Act violation against D.C. Crisp, pursuant to 16 U.S.C. § 3372(a)(1), for illegally taking wildlife on September 7, 2011, on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13. [Id. at 2-3]. Count Three alleged a Lacey Act violation against D.C. Crisp, Tommy Gene Queen, and Mitchell Allen Jenkins, pursuant to 16 U.S.C. § 3372(a)(1), for illegally taking wildlife on October 20, 2011, on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13. [Id. at 3]. Count Four alleged a Lacey Act violation against D.C. Crisp, D.F. Crisp, Tommy Gene Queen, and Mitchell Allen Jenkins, pursuant to 16 U.S.C. §

_____

[8] Defendant Jenkins has neither entered a guilty plea in this matter nor joined in any of the dispositive motions discussed herein.

3372(a)(1), for illegally taking wildlife on October 26, 2011, on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13.  [Id. at 4].  Count Five alleged a Lacey Act violation against all five defendants, pursuant to 16 U.S.C. § 3372(a)(1), for illegally taking wildlife on November 9, 2011, on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13.  [Id. at 4-5].  Count Six alleged a Lacey Act violation against all five defendants, pursuant to 16 U.S.C. § 3372(a)(1), for illegally taking wildlife on November 9, 2011, (on an occasion separate from that charged in Count Five) on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13.  [Id. at 5-6].   Counts Seven and Eight each alleged D.C. Crisp, on December 13, 2011, and October 8, 2012, respectively, possessed different firearms while being an unlawful user of and addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3). [Id. at 6].

Defendants were arraigned on June 17, 2013, and entered pleas of not guilty.  Following their arraignments, defendants were released under pretrial supervision upon stated conditions.  [CR-16 Docs. 8; 10; 17].  On December 4, 2013, in nearly identical motions and memoranda, the

defendants moved the Court to dismiss the Indictment filed against them based upon the alleged want of subject matter jurisdiction. [CR-16 Docs. 77-90]. The Government responded to these motions by filing its Memorandum in Opposition together with exhibits. [CR-16 Docs. 91; 91-1 to 91-17]. The Court heard arguments from counsel for all parties on March 24, 2014, regarding defendants' motions to dismiss for lack of subject matter jurisdiction. At the conclusion of the hearing, the Court ordered additional briefing on the issue of the Court's subject matter jurisdiction. On March 28, 2014, Defendant D.F. Crisp filed a Motion to Dismiss for Entrapment and Violation of Due Process [CR-16 Doc. 98], as well as a motion and brief supplementing his Motion to Dismiss for Lack of Jurisdiction. [CR-16 Docs. 99; 101]. On that same day, Defendant Bumgarner filed a Motion to Dismiss for Entrapment and Violation of Due Process [CR-16 Doc. 102], as well as a motion and brief supplementing his Motion to Dismiss for Lack of Jurisdiction. [CR-16 Docs. 100; 102-1]. Finally, Defendant D.C. Crisp, on March 28, 2014, filed a motion and brief supplementing his Motion to Dismiss for Lack of Jurisdiction [CR-16 Docs. 103; 104]. His brief, however, contained an argument asserting the Indictment against him should be dismissed based upon law enforcement officers' alleged due process violations. [CR-16 Doc. 104 at 9]. The

Government responded with separate memoranda filed April 11, 2014, and April 17, 2014. [CR-16 Docs. 105; 106]. All of the defendants' motions are now ripe for the Court's review.

## STANDARD OF REVIEW[9]

Federal subject matter jurisdiction in a criminal case – this Court's statutory or constitutional power to adjudicate cases – can never be forfeited or waived. Consequently, defects in subject matter jurisdiction require correction regardless of when the error is raised. United States v. Cotton, 535 U.S. 625, 630 (2002); United States v. Hartwell, 448 F.3d 707, 715 (4th Cir. 2006) (any action by a court without subject matter jurisdiction is ultra vires and therefore void).

In contrast, certain defects in an indictment are not fatal to a court's subject matter jurisdiction because the grand jury right can be waived. Cotton, 535 U.S. at 630; United States v. Carr, 303 F.3d 539, 542–43 (4th Cir. 2002). Cotton thus directs the Court to examine the nature of the error about which the defendants complain. The distinction between indictments containing a non-fatal defect versus those containing a defect depriving a court of subject matter jurisdiction lies with whether the grand jury failed to

---

[9] The review standard in this portion of the Order applies to defendants' dismissal motions based upon subject matter jurisdiction. The standards of review for the defendants' two remaining issues, the Government's alleged entrapment and due process violations, will be addressed in the discussion of their respective sections below.

allege an essential element of the crime, which is a non-fatal defect, or whether it failed to allege behavior that was criminal, a fatal defect going to a court's power to adjudicate guilt and punishment. Hartwell, 448 F.3d at 717. See also United States v. Peter, 310 F.3d 709, 715–16 (11th Cir. 2002) (holding a court is without jurisdiction to accept a guilty plea to a non-offense and all criminal proceedings thereafter are void); United States v. Moloney, 287 F.3d 236, 239 (2d Cir. 2002) (holding a guilty plea does not waive a claim that the indictment charges a non-offense because such a claim asserts a fatal jurisdictional defect); United States v. Rosa–Ortiz, 348 F.3d 33, 36 (1st Cir. 2003) (citing Peter and holding a court lacks subject matter jurisdiction to enter a judgment of conviction when the indictment charges no offense under applicable law).

In case CR-15, defendants Jerry and Jerome Parker contend the Court lacks subject matter jurisdiction over one overt act charged in Count One and the offense charged in Count Two. With regard to case CR-16, defendant Bumgarner contends the Court lacks subject matter jurisdiction over the offenses charged in Count One, Count Five, and Count Six against him. [CR-16 Doc. 77 at 1-6]. Defendant D.C. Crisp contends the Court lacks subject matter jurisdiction over the offenses charged in Counts One through Six, inclusive, against him. [CR-16 Doc. 78 at 1-6]. Defendant

D.F. Crisp contends the Court lacks subject matter jurisdiction over the offenses charged in Count One, Count Four, Count Five, and Count Six against him.  [CR-16 Doc. 86 at 1-6].

Where, as here, the alleged defect is not merely a missing element or fact, but is an allegation of conduct that, as a matter of law, would be beyond the purview of the statutes charged, the alleged defect implicates this Court's subject matter jurisdiction and must be addressed.

The issue to be resolved is whether the alleged killing of wildlife occurred on property over which the federal government had authority to exercise legislative control.  Because the issue in these cases is before the Court on the defendants' motions to dismiss, the Court must assume that all facts proffered by the Government or alleged by the grand jury are true. United States v. Terry, 257 F.3d 366, 367 (4th Cir. 2001); United States v. Lund, 853 F.2d 242, 244 (4th Cir. 1988) (assuming, for purposes of defendant's dismissal motion, that he participated in all acts described in the indictment).

## FACTUAL BACKGROUND IN CR-15

Set forth below are the facts alleged by the grand jury in the "Overt Acts" portion of the CR-15 Indictment which the Court assumes to be true at this stage of the proceedings.

1) JERRY FRANCIS PARKER was an owner and operator of War Paint Kennels, a hunting guide service located in Rabun County, Georgia. On or about October 24, 2011, in Rabun County, JERRY FRANCIS PARKER received $1500 in cash to provide a multi-day guided bear hunt to a customer ("the customer") whom he knew to be a North Carolina resident and to be licensed to hunt only in North Carolina. The customer had arranged for this hunting trip through telephone and email communications between himself in the Western District of North Carolina and JERRY FRANCIS PARKER in Georgia.

2) On or about October 24, 2011, JERRY FRANCIS PARKER directed CARL W. JUNALUSKA II to guide the customer on a bear hunt. JUNALUSKA complied, and took the customer hunting in Macon County, North Carolina, in the Nantahala National Forest.  JUNALUSKA did not have a valid North Carolina guide license. Neither JUNALUSKA, JERRY FRANCIS PARKER, nor War Paint Kennels possessed a United States Forest Service special-use authorization, which was legally required in order to conduct a work activity or service, including a hunting guide service, in the national forest.

3) Later in the day on or about October 24, 2011, JEROME BROCK PARKER guided the customer on a bear hunt in Macon County, North Carolina, in the Nantahala National Forest. JEROME BROCK PARKER directed the customer to shoot an American black bear, and the customer did so, killing it. That bear was a juvenile, weighing less than the 50 pounds minimum required by North Carolina law. North Carolina law limits a hunter to taking only one bear per season. JEROME BROCK PARKER informed the customer that he could tag and report the bear, in compliance with state wildlife laws, but that if the customer wanted a bigger bear they could get one. JEROME BROCK PARKER called his father, JERRY FRANCIS PARKER, and explained what had happened, and JERRY FRANCIS PARKER told the customer that it was up to the customer to decide what to do, but if the customer wanted to keep hunting, they could get him another bear. After that conversation, JEROME BROCK PARKER advised the customer to hide the bear carcass in a cave, not report it, and

to continue hunting. The customer then hid the carcass in a cave and continued hunting. JEROME BROCK PARKER, also, did not possess a United States Forest Service special-use authorization permitting him to conduct a work activity or service in the national forest.

4) On or about October 25 and 26, 2011, JERRY FRANCIS PARKER arranged for other persons whose identity is known to the Grand Jury to guide the customer on bear hunts in Macon County, North Carolina, but no bear was taken.

5) On or about October 27, 2011, JERRY FRANCIS PARKER guided the customer on a bear hunt in Macon County, North Carolina, but this hunt was unsuccessful. JERRY FRANCIS PARKER then drove the customer into Rabun County, Georgia, and guided him on a bear hunt there, although he knew the customer did not have a Georgia hunting license. That hunt, too, was unsuccessful.

6) Later on or about October 27, 2011, JERRY FRANCIS PARKER arranged for WALTER HENRY STANCIL to take the customer on a bear hunt in Rabun County, Georgia. STANCIL took the customer to a location in Rabun County and directed the customer to an area where STANCIL maintained a bait site, using a chocolate product as the bait. Georgia law prohibits the use of any type of bait to concentrate the bear population in any area or to lure them to any location that gives or might give a hunter an unnatural advantage when hunting bear. STANCIL described the various bears that frequented that site and gave the customer instructions on which ones should or should not be shot. Later that day, at that site, the customer shot and killed an adult black bear. WALTER HENRY STANCIL and his adult son, WALTER CALE STANCIL assisted the customer in transporting the bear carcass to the residence of JERRY FRANCIS PARKER, using WALTER CALE STANCIL's Toyota truck. JERRY FRANCIS PARKER and the customer processed the bear carcass. PARKER directed the customer to falsely report that the bear had been taken in North Carolina by "punching" his North Carolina license and reporting the kill to North Carolina wildlife authorities within 48 hours.

7) On or about October 28, 2011, the customer transported the skin and meat from the bear from Rabun County, Georgia, into Macon County, North Carolina.

[CR-15 Doc. 1 at 2-4].

## FACTUAL BACKGROUND IN CR-16

Set forth below are the facts alleged by the grand jury in the CR-16

Indictment which the Court, like the prior factual recitation, assumes to be

true.

### COUNT ONE

From on or about November 17, 2010, through on or about December 13, 2011, in Graham County, within the Western District of North Carolina, and elsewhere, the defendants 1) DAVID CHADWICK CRISP, 2) DAVID FRANK CRISP; 3) TOMMY GENE QUEEN, 4) MITCHELL ALLEN JENKINS, and 5) ROBERT WILLIE BUMGARNER, did unlawfully, willfully, knowingly and intentionally combine, conspire, confederate and agree with one another and with others known and unknown to the Grand Jury to knowingly acquire, receive, and transport wildlife with a market value in excess of $350, that is, American black bear and whitetail deer, which the defendants knew was taken, possessed, and transported in violation of and in a manner unlawful under Federal law, that is, Title 18, United States Code, § 13 and Title 36 CFR § 261.8(a), incorporating North Carolina law, that is, N.C.G.S. §§ 113-270.3(c), 113-291.1(b)(2), 113-291.2(a), 113-294(c1), 113-294(d), 113-294(r), and 15A N.C.A.C. 10B.0107, all in violation of Title 16, United States Code, §§ 3372(a)(1) and 3373(d)(1)(B).

### OVERT ACTS

In furtherance of this conspiracy, and in order to effect the object thereof, the defendants did commit the overt acts, among others, that are set forth more fully in Count Two through Count

Six of this Bill of Indictment, which are incorporated herein by reference.

## OBJECT OF THE CONSPIRACY

It was the object of the conspiracy that the defendants would illegally take wildlife, that is, American black bear and whitetail deer, within the Nantahala National Forest and then transport that wildlife out of the National Forest for purposes of dismembering that wildlife and dividing portions of that wildlife among themselves and others. All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

On or about September 7, 2011, in the Nantahala National Forest, in Graham County, within the Western District of North Carolina, and elsewhere, the defendant, 1) DAVID CHADWICK CRISP, did knowingly acquire, receive, and transport wildlife with a market value in excess of $350, that is, an American black bear, which the defendant knew was taken, possessed, and transported in violation of and in a manner unlawful under Federal law, that is, Title 18, United States Code, § 13 and Title 36 CFR § 261.8(a), incorporating North Carolina law, that is, N.C.G.S. §§ 113.270.3(c), 113-291.1(b)(2), 113-291.2(a), 113-294(c1), and 113-294(r), in that the black bear had been taken during the closed season, had been taken with the use and aid of any artificial light, had been taken with the use and aid of a sugar-based material as bait, and of processed food products as bait, to wit, chocolate waste, had been taken without being validated on a big game harvest report card at the site of kill, and had been taken without being validated as a big game kill with the nearest big game cooperator agent. All in violation of Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B).

## COUNT THREE

On or about October 20, 2011, in the Nantahala National Forest, in Graham County, within the Western District of North Carolina, and elsewhere, the defendants, 1) DAVID CHADWICK CRISP, 3) TOMMY GENE QUEEN, and 4) MITCHELL ALLEN JENKINS, did knowingly acquire, receive, and transport wildlife with a market value in excess of $350,

that is, an American black bear, which the defendants knew was taken, possessed, and transported in violation of and in a manner unlawful under Federal law, that is, Title 18, United States Code, § 13 and Title 36 CFR § 261.8(a), incorporating North Carolina law, that is, N.C.G.S. §§ 113-270.3(c), 113-291.2(a), and 113-294(c1), and 15A N.C.A.C. 10B.0107, in that the black bear had been taken as a female American black bear with a cub or cubs at its side, had been taken without being validated on a big game harvest report card at the site of kill, and had been taken without being validated as a big game kill with the nearest big game cooperator agent, and did aid and abet one another in the commission of such offense. All in violation of Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B), and Title 18, United States Code, § 2.

## COUNT FOUR

On or about October 26, 2011, in the Nantahala National Forest, in Graham County, within the Western District of North Carolina, and elsewhere, the defendants, 1) DAVID CHADWICK CRISP, 2) DAVID FRANK CRISP, 3) TOMMY GENE QUEEN, and 4) MITCHELL ALLEN JENKINS, did knowingly acquire, receive, and transport wildlife with a market value in excess of $350, that is, a whitetail deer, which the defendants knew was taken, possessed, and transported in violation of and in a manner unlawful under Federal law, that is, Title 18, United States Code, § 13 and Title 36 CFR § 261.8(a), incorporating North Carolina law, that is, N.C.G.S. §§ 113.270.3(c), 113-291.2(a), and 113-294(d), in that the whitetail deer had been taken during the closed season, had been taken without being validated on a big game harvest report card at the site of kill, and had been taken without being validated as a big game kill with the nearest big game cooperator agent, and did aid and abet one another in the commission of such offense. All in violation of Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B), and Title 18, United States Code,§ 2.

## COUNT FIVE

On or about November 9, 2011, in the Nantahala National Forest, in Graham County, within the Western District of North Carolina, and elsewhere, the defendants, 1) DAVID

CHADWICK CRISP, 2) DAVID FRANK CRISP, 3) TOMMY GENE QUEEN, 4) MITCHELL ALLEN JENKINS, and 5) ROBERT WILLIE BUMGARNER, did knowingly acquire, receive, and transport wildlife with a market value in excess of $350, that is, an American black bear, which the defendants knew was taken, possessed, and transported in violation of and in a manner unlawful under Federal law, that is, Title 18, United States Code § 13 and Title 36 CFR § 261.8(a), incorporating North Carolina law, that is, N.C.G.S. §§ 113.270.3(c), 113-291.2(a), and 113-294(c1), in that the black bear had been taken without being validated on a big game harvest report card at the site of kill, and had been taken without being validated as a big game kill with the nearest big game cooperator agent, and did aid and abet one another in the commission of such offense. All in violation of Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B), and Title 18, United States Code, § 2.

## COUNT SIX

On or about November 9, 2011, in the Nantahala National Forest, in Graham County, within the Western District of North Carolina, and elsewhere, the defendants, 1) DAVID CHADWICK CRISP, 2) DAVID FRANK CRISP, 3) TOMMY GENE QUEEN, 4) MITCHELL ALLEN JENKINS, and 5) ROBERT WILLIE BUMGARNER, on a separate occasion from that charged in Count Five of this Bill of Indictment, did knowingly acquire, receive, and transport wildlife with a market value in excess of $350, that is, an American black bear, which the defendants knew was taken, possessed, and transported in violation of and in a manner unlawful under Federal law, that is, Title 18, United States Code, § 13 and Title 36 CFR § 261.8(a), incorporating North Carolina law, that is, N.C.G.S. §§ 113.270.3(c), 113-291.2(a), and 113-294(c1), in that the black bear had been taken without being validated on a big game harvest report card at the site of kill, and had been taken without being validated as a big game kill with the nearest big game cooperator agent, and did aid and abet one another in the commission of such offense. All in violation of Title 16, United States Code, Sections 3372(a)(l) and 3373(d)(1)(B), and Title 18, United States Code, § 2.

[CR-16 Doc. 1 at 2-6].

# DISCUSSION

The defendants advance three arguments in an effort to persuade the Court to dismiss the Indictments against them. First, they allege the Court lacks subject matter jurisdiction over various charges set forth in the Indictments. The defendants contend that the animals killed, assuming they were taken on federal land in the Nantahala National Forest ("NNF"),[10] were slain, for example, on "such tracts of property that was [sic] not condemned and cannot be owned by the government." [CR-15 Doc. 77 at 3]. In short, the defendants' first argument asserts a deficiency in the Government's authority to legislate with regard to the land it acquired encompassing the location of the offenses. The Government's lack of authority over the pertinent sites within the NNF, according to the defendants' argument, provides the Government no power to prosecute or punish the defendants' conduct resulting in the taking of wildlife there and thus deprives this Court of subject-matter jurisdiction. Additionally, the

---

[10] As a defense in this matter, the defendants assert that no wildlife was taken on federal forest land at all but instead was killed on private property never owned nor regulated by the federal government. The precise location of each wildlife kill site, however, is a matter that must be resolved by the trier of fact, in this case, a petit jury.

defendants contend that the grand jury's allegations are insufficient to assert any allegedly unlawful activities affecting interstate or foreign commerce under the Lacey Act. Second, four of the named defendants assert that they were entrapped by the law enforcement officers conducting the investigation in these matters. Finally, all of the defendants claim that the allegedly wrongful conduct by the officers carrying out this investigation was of such magnitude as to deprive them of their constitutional right to due process. These three[11] arguments raised by the defendants will be addressed <u>seriatim</u>.

## I.    Subject Matter Jurisdiction Over National Forest Lands

### A.    <u>North Carolina's Land Grant Authority to the United States</u>

#### 1.    *N.C. Gen. Stat. § 104-5*

In the years following the Civil War, state and federal officials, industrialists, conservationists, and concerned citizens throughout the country began discussions, at both the local and national level, about

---

[11] The Parker defendants in CR-15 present a fourth argument asserting that "the government has failed to establish the necessary elements of knowledge, intent, or agreement" by these defendants to sustain federal jurisdiction. [CR-15 Doc. 79 at 5; CR-15 Doc. 81 at 5]. As an initial matter, the grand jury found sufficient facts probably exist to support each of these elements, and as such, these issues must be resolved by a petit jury going forward. Nevertheless, this potential failure of proof is not, as the Parker defendants contend, a legal issue implicating subject matter jurisdiction. The behavior of the Parker defendants consistent with facts supporting these elements, if believed by a petit jury, is conduct proscribed by federal law and subject to punishment. In other words, it is conduct that would support a conviction for a federal offense, as contrasted with behavior that would amount to no offense under applicable federal law.

timber as a natural resource, its depletion, and the need or desire for a national forestry policy.[12] These discussions percolated up to state houses and Congress who, following debate and compromise, enacted legislation. As discussed in greater detail in Part I.C., below, the Executive and Legislative Branches of the federal government, in the late 1800s, began proclaiming public lands on the western frontier as parks and forest reservations. Having acquired the lands west of the Mississippi by purchase or conquest before granting statehood to the various U.S. territories, the federal government encountered little legal resistance, in pursuing its ambitious forest land set-aside project, from newly minted States.

On the East Coast, however, where title to property did not originate in the United States, the federal government had to begin a delicate conversation with the States and their citizens, who were the primary landholders of forested places. This discussion was focused upon the federal government's acquisition and administration of certain real property which needed to be accomplished within the constitutional parameters of our dual-sovereign system of government. As a concession to the States,

---

[12] Gerald W. Williams, The USDA Forest Service - The First Century, at 1-2, USDA FS-650 (2005) available at http://www.foresthistory.org/ASPNET/Publications/first_century/sec1.htm (last accessed July 31, 2014) (herein "Williams"). Screen-shots of the pertinent pages of this website and all other websites cited herein are attached in the Appendix to this Memorandum Decision and Order.

Congress made clear that land obtained for forest reserves would be jointly governed by both sovereigns.

> The jurisdiction, both civil and criminal, over persons within such reservations, shall not be affected or changed by reason of the existence of such reservations, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that the State wherein any such reservation is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

Act of June 4, 1897, ch. 2, 30 Stat. 11, 32, 36 (1897) (herein the "Forest Management Act").  When considering how the federal government might exercise jurisdictional authority over any national forest lands, Congress determined that seeking permission, rather than forgiveness, from the States in this regard was the more prudent approach, paving the way for a less contentious acquisition process.

At the end of the Nineteenth Century, having learned that the federal government was considering purchasing land in the Blue Ridge mountain range of the southeastern United States to become a national forest, the General Assembly of North Carolina prospectively ceded jurisdiction to the United States over lands within the state's borders contemplated for use as such.  North Carolina's 1901 statute provided as follows:

> Section 1. That the consent of the General Assembly of North Carolina be and is hereby given to the acquisition by the United

States by purchase, or by condemnation with adequate compensation, except as hereinafter provided, of such lands in Western North Carolina as in the opinion of the Federal Government may be needed for the establishment of such a national forest reserve in that region: Provided, that the State of North Carolina shall retain a concurrent jurisdiction with the United States in and over such lands so far that civil process in all cases, and such criminal process as may issue under the authority of the State of North Carolina against any person charged with the commission of any crime without or within said jurisdiction, may be executed thereon in like manner as if this act had not been passed.

Sec. 2.  That power is hereby conferred upon Congress to pass such laws as it may deem necessary to the acquisition as hereinbefore provided, for incorporation in said nation forest reserve, as such forest covered lands lying in Western North Carolina as in the opinion of the Federal Government may be needed for this purpose:  **Provided, that as much as two hundred acres of any tract of land occupied as a home by bona fide residents in this State at the date of the ratification of this act shall be exempt from the provisions of this section.**

Sec. 3.  Power is hereby conferred upon Congress to pass such laws and to make or provide for the making of such rules and regulations, of both civil and criminal nature and provide punishment therefor, as in its judgment may be necessary for the management, control, and protection of such lands as may be from time to time acquired by the United States under the provisions of this act.

Sec. 4.  That this act shall be in force from and after its ratification.

In the General Assembly read three times, and ratified this the 18th day of January, A.D. 1901.

1901 N.C. Sess. Laws, ch. 17,[13] later codified at N.C. Gen. Stat. § 104-5 (emphasis added).

Reading the original enactment of section 104-5 on a paragraph by paragraph basis makes plain the intent of the North Carolina legislature to convey sweeping legislative authority, and comprehensive jurisdiction, to the federal government. Section 1 grants the federal government the broad right to purchase – either voluntarily (by negotiated sale) or involuntarily (by condemnation) – property in Western North Carolina for the establishment of federal forest lands. Further, even though the federal government would become the fee simple owner of the property so acquired, North Carolina would retain concurrent jurisdiction with regard to civil and criminal process. North Carolina's retention of jurisdictional rights, as explained by the Supreme Court, served a salutary purpose. It "was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals[.]" Ft. Leavenworth R. v. Lowe, 114 U.S. 525, 535 (1885) (describing similar provision of Massachusetts law).

Having granted the federal government the right to acquire North Carolina property in Section 1, the North Carolina legislature in Section 2 granted Congress the authority to "pass such laws as it may deem

_____

[13] From 1901 through 1929, when the statute took its present form, it was amended in ways not relevant to this discussion.

necessary to the acquisition" of such property in North Carolina. Sensitive to the property rights of its residents, however, North Carolina wished to provide protection for its rural mountain homesteaders. Section 2 thus appears to exempt estates of less than two hundred acres "from the provisions of this section." The defendants argue that this clause imposes on the Government the obligation to prove in this criminal proceeding that the property where the alleged unlawful events occurred was not a part of such a residential tract at the time of acquisition by the federal government. If the Government is unable to do so, defendants argue, then the property was exempt from such acquisition and control by the federal government as national forest land and the federal government possesses no jurisdiction. The Government, on the other hand, argues that this proviso is an affirmative defense in a condemnation proceeding: a right belonging to the homesteader whose lands the federal government seeks to condemn. It could only be employed, according to the Government, by the homesteader at the time of the federal government's initiation of an involuntary acquisition. Absent that, title would pass to the federal government and the property would become part of the national forest. Hence, the Government argues, the proviso imposes no additional element to proving the defendants' crimes herein.

This dispute as to the construction of Section 2 boils down to whether the proviso is a self-executing homestead exemption that by operation of law automatically removed from the universe of potential federal properties "as much as two hundred acres of any tract of land occupied as a home" (as defendants argue), or whether the proviso is in the nature of an avoidance or an affirmative defense that, if raised "by <u>bona</u> <u>fide</u> residents" at the time of condemnation would bar the federal government from taking their exempted land involuntarily (as the Government argues). The structure of the original § 104-5 statute discloses that the North Carolina legislature intended the proviso set forth in section 2 to be an avoidance, not a self-executing exemption.

The Court begins by considering what the North Carolina General Assembly accomplished in drafting section 2. This section contains operational provisions: it gives the federal government the authority to formulate legislation aimed at the federal government's *manner of acquiring* North Carolina property from the State's residents. The federal government, therefore, was given the authority to develop a legal procedure by which it could acquire property in North Carolina via condemnation for use as federal forest land. The federal government adopted such procedures when it passed the Weeks Forestry Act in 1911,

discussed more fully below.  Given that the North Carolina legislature granted the federal government unbridled authority to develop a procedure to acquire land within North Carolina for the common good, it follows logically that the State legislature would then place the burden of blocking any such acquisition on the individual property owner intent upon maintaining his land, *if he so chose*.

Put simply, the State gave the federal government the power to create a cause of action enabling it to take North Carolina land for federal forest purposes. Aggrieved North Carolina land owners, on the other hand, were given a trump card of sorts by the General Assembly in the form of the affirmative defense of exemption. "Generally speaking, affirmative defenses share the common characteristic of a bar to the right of recovery even if the general complaint were more or less admitted to." Emergency One, Inc., v. Am. Fire Eagle Engine Co., 332 F.3d 264, 271 (4th Cir. 2003) (citation omitted). At the very least, the land owner could stop the federal government's seizure of his home (and up to 200 acres of his land) no matter how legitimate or generous the federal government's acquisition procedure turned out to be.  In addition, Section 2 is somewhat akin to the affirmative defense of set-off.  For example, a land owner, holding 600 acres of property that the government would like to acquire, could claim as

exempt only "as much as two hundred acres" and only if that two hundred acres was a part of a "tract of land occupied as a home[.]"  Accordingly, the land owner could set-off his home and two hundred acres of his choice;[14] the remaining four hundred acres would still be subject to federal acquisition for valuable consideration.  Since the final choice of which two hundred acres to keep presumably would reside with the homesteader, it is not implausible to conclude that the preliminary choice of *whether* to claim any exempt property at all is one that would fall on the homesteader to assert at the outset.  Consequently, while the North Carolina legislature prohibited Congress from forcing a <u>bona</u> <u>fide</u> resident from relinquishing his home and up to two hundred acres of his property, it did not permit such resident to sleep on his rights.  He had the duty to object, when the federal government came calling for his land, or not be heard to complain thereafter.

Section 3, the last substantive section of the enactment, confers broad power on Congress to pass civil and criminal laws regulating the

---

[14] Another argument weighing against the statute being self-executing is that the statute is silent on the issue of *which* two hundred acres of an undivided homestead tract exceeding that number would automatically become exempt. Who would choose the particular 200 acres and what criteria would be used in making that choice? The North Carolina General Assembly would not have intended, by operation of law, the introduction of such uncertainty in land transactions clearly contemplated for use as federal forests.  The defendants' argument, however, is entirely dependent on the North Carolina General Assembly having intended such uncertainty.

management, control, and protection of the forest lands. As will be seen further below, North Carolina's grant of legislative power pursuant to § 104-5 enabled the federal government to exercise concurrent jurisdiction pursuant to the Enclave Clause of the Constitution, U.S. Const. art. I, § 8, cl.17, over some of the forest land at issue in this case.

2.    *N.C. Gen. Stat. § 104-7*

In 1907, six years after enacting legislation permitting the federal government to acquire title and concurrent jurisdiction over forest lands in North Carolina pursuant to § 104-5, the State's General Assembly passed a similar law beneficial to the federal government but for a different purpose. In accordance with what would later become N.C. Gen. Stat. § 104-7, the North Carolina legislature granted the federal government the authority to acquire by purchase, condemnation, or otherwise, pursuant to the Enclave Clause, "any land in the State required for customhouses, courthouses, post offices, arsenals, or other public buildings whatever, or **for any other purposes of the government**." 1907 N.C. Sess. Laws, ch. 25,[15] later codified at N.C. Gen. Stat. § 104-7 (emphasis added). As for the State's conveyance of jurisdiction to the federal government, the statute stated:

---

[15] N.C. Gen. Stat. § 104-7 was amended in 2005, 2009, and 2012.

Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State; but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands. The jurisdiction ceded shall not vest until the United States shall have acquired title to said lands by purchase, condemnation, or otherwise.

Id. For nearly one hundred years, before the reach of this statute's grant of land acquisition authority was greatly curtailed by amendment in 2005, the federal government could acquire land within North Carolina, for any federal governmental purpose, and would enjoy legislative jurisdiction over said land automatically upon title passing to the United States. As discussed below, North Carolina's grant of legislative power to the federal government pursuant to § 104-7 enabled the federal government to exercise concurrent jurisdiction pursuant to the Enclave Clause over the remaining forest land at issue herein.

B.    The Enclave Clause of the U.S. Constitution

The Supremacy Clause, U.S. Const., art. VI, § 2, grants the federal government the power to acquire title to real property within the States, whether by purchase, gift, or condemnation, without the consent of the State in which such property is located. Kohl v. United States, 91 U.S. 367, 371 (1875). But without the State's "consent" the United States does not obtain the jurisdictional benefits conferred by the Enclave Clause, Art. I, §

8, cl. 17.  Therefore, where the federal government has acquired property in North Carolina without such consent, its status as title holder is the same as that of an ordinary private proprietor. <u>James v. Dravo Contracting Co.</u>, 302 U.S. 134, 141-42 (1937).  To better understand the present role of the Enclave Clause, it is necessary to understand its origin.

Near the end of the Revolutionary War, the delegates assembled in Philadelphia under the Articles of Confederation suffered continued harassment at the hands of some disgruntled insurrectionists living in Pennsylvania.  So fearful of these insurgents were the delegates that they ultimately moved to New Jersey. Joseph Story attributed to this event the Framers' creation of the Enclave Clause for inclusion into the Constitution.

> It is not improbable, that an occurrence, at the very close of the revolutionary war, had a great effect in introducing this provision into the constitution. At the period alluded to, the congress, then sitting at Philadelphia, was surrounded and insulted by a small, but insolent body of mutineers of the continental army. Congress applied to the executive authority of Pennsylvania for defence; but, under the ill-conceived constitution of the state at that time, the executive power was vested in a council consisting of thirteen members; and they possessed, or exhibited so little energy, and such apparent intimidation, that congress indignantly removed to New Jersey, whose inhabitants welcomed them with promises of defending them.  Congress remained for some time at Princeton without being again insulted, till, for the sake of greater convenience, they adjourned to Annapolis. The general dissatisfaction with the proceedings of Pennsylvania, and the degrading spectacle of a fugitive congress, were sufficiently striking to produce this remedy.  Indeed, if such a lesson could have been lost upon

the people, it would have been as humiliating to their intelligence, as it would have been offensive to their honour.

3 Joseph Story, Commentaries, ch. XXIII, § 1214 (1833). The Enclave Clause confers power upon Congress:

> **To exercise exclusive legislation** in all cases whatsoever, over [the District of Columbia], **and to exercise like authority** over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.

U.S. Const. art. I, § 8, cl.17 (emphasis added). The Enclave Clause envisioned two distinct goals: granting Congress unfettered power over the district to be established as the nation's capital, and granting Congress like power over property acquired inside the boundaries of States, with the consent of such States, for national safety and enjoyment.

> The other part of the power, giving exclusive legislation over places ceded for the erection of forts, magazines, &c., seems still more necessary for the public convenience and safety. The public money expended on such places, and the public property deposited in them, and the nature of the military duties, which may be required there, all demand, that they should be exempted from state authority. In truth, it would be wholly improper, that places, on which the security of the entire Union may depend, should be subjected to the control of any member of it. The power, indeed, is wholly unexceptionable; since it can only be exercised at the will of the state; and therefore it is placed beyond all reasonable scruple.

3 Joseph Story, Commentaries, ch. XXIII, § 1219 (1833).

The Supreme Court, over time, has construed this Clause to expand the definition of "other needful buildings" while simultaneously narrowing the Clause's definition of "exclusive jurisdiction." See James, 302 U.S. at 143 ("We construe the phrase 'other needful buildings' as embracing whatever structures are found to be necessary in the performance of the functions of the federal government."). While the Framers designed the Enclave Clause to provide Congress "exclusive" jurisdiction over enclaves, any jurisdiction was predicated upon the consent of a State that was authorizing acquisition by the federal government.

> Thus if the United States acquires with the 'consent' of the state legislature land within the borders of that State by purchase or condemnation for any of the purposes mentioned in Art. I, s 8, cl. 17, or if the land is acquired without such consent and later the State gives its 'consent,' the jurisdiction of the Federal Government becomes 'exclusive.' Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property, however it may be acquired. In either event—whether the land is acquired by purchase or condemnation on the one hand or by cession on the other—**a State may condition its 'consent' upon its retention of jurisdiction over the lands consistent with the federal use**.

Paul v. United States, 371 U.S. 245, 264-65 (1963) (emphasis added). It is in this sense that Congress actually receives and accepts derivative legislative power over the real property acquired from a consenting State under the Enclave Clause. "[T]he legislative jurisdiction acquired may

range from exclusive federal jurisdiction with no residual state police power, to concurrent, or partial, federal legislative jurisdiction, which may allow the State to exercise certain authority." Kleppe v. New Mexico, 426 U.S. 529, 542 (1976) (internal citations omitted).

The federal government's acceptance of jurisdiction from a State, and therefore the quantum of jurisdiction the federal government derives over property it acquires within the State, has not always been clear. For example, prior to February 1, 1940,[16] the federal government was deemed to have implicitly accepted such jurisdiction and jurisdictional limitations as offered by a State in conjunction with its residents' conveyance of property. Lowe, 114 U.S. at 528 ("As we have said, there is no evidence before us that any application was made by the United States for this legislation, but, as it conferred a benefit, the acceptance of the act is to be presumed in the absence of any dissent on their part."). The Fourth Circuit likewise found the federal government to have tacitly accepted such jurisdiction, and the government's tacit acceptance arises from Congress' promulgation of 16

---

[16] Effective February 1, 1940, Congress amended certain statutes, including 40 U.S.C. § 255 (now codified at 40 U.S.C. § 3112). Pertinent to this discussion, Congress mandated that "[u]nless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted." Act of February 1, 1940, ch.18, 54 Stat. 19.

U.S.C. § 551.[17]  United States v. Raffield, 82 F.3d 611, 612 (4th Cir. 1996);

Markham v. United States, 215 F.2d 56, 58 (4th Cir. 1954).

After February 1, 1940, a State's transfer of legislative jurisdiction over real property did not take effect for federal purposes until formally accepted by the head of the federal department that would have control over the land. 40 U.S.C. § 3112(b) ("The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State[.]").

C.    The Nation's Forests

The years preceding the Civil War saw the establishment of the Department of the Interior in 1849.  Act of March 3, 1849, 9 Stat. 395.  The Department of Agriculture, future home of the Forest Service, came about shortly thereafter.  Act of May 15, 1862, 12 Stat. 387. The establishment of a national forest policy in general, and the idea behind designating national forest lands in particular, came to fruition following the War.  The War

---

[17] In pertinent part, section 551 states, "The Secretary of Agriculture shall make provisions for the protection against ... depredations upon the public forests and national forests ... and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely to regulate their occupancy and use and to preserve the forests ... and any violation of ... such rules and regulations shall be punished by a fine ... or imprisonment."

occasioned not only the tragic loss of life, but also horrific property damage and destruction.[18]

The rebuilding in the South and the population growth in the North after the Civil War, together with the nation's westward expansion, hinted at an impending lumber famine not previously experienced in this country. Between 1850 and 1910, the nation's annual timber lumber production increased eight-fold.[19] With this deforestation to satisfy the lumber needs of a growing population came soil erosion, sedimentation of watersheds, and the denudation of significant acreage. In 1864, just prior to the War's end, George Perkins Marsh published Man and Nature:  Or the Earth as Modified by Human Action, Harvard University Press. This work "was cited almost immediately in executive reports, such as the annual report of the commissioner of agriculture.  [Marsh] was cited on the floor of Congress, in committee reports, by other scientists, and eventually by land managers." Harold K. Steen, The Beginning of the National Forest System: National Forests 1891-1991, at 5, USDA FS-488 (May 1991) available at http://books.google.com/books/about/The_Beginning_of_the_National_For

---

[18] See Williams, supra, at footnote 12.

[19] William E. Shands, The Lands Nobody Wanted: The Legacy of the Eastern National Forests, at 4 available at http://www.foresthistory.org/Publications/Books/Origins_National_Forests/sec3.htm  (last accessed July 31, 2014) (herein "Shands") (see Appendix).

[est_Sys.html?id=XvYTAAAAYAAJ](est_Sys.html?id=XvYTAAAAYAAJ) (herein "Steen") (last accessed July 31, 2014) (<u>see</u> Appendix).  In 1872, Congress "set apart a certain Tract of Land lying near the Head-waters of the Yellowstone River as a public park" thus creating this country's first national park. Act of March 1, 1872, 17 Stat. 32-33.  Marsh's book, together with the paper "On the Duty of Governments in the Preservation of Forests" presented by Franklin B. Hough at the annual meeting of the American Association for the Advancement of Science in 1873, prompted Congress to act further on forestry issues.

Congress' formal acts on forestry policy, initially, were snippets of lawmaking.  It should be noted here that the first three most significant pieces of federal forestry legislation came about merely as amendments to other bills.  The first of these, establishing the nation's first Forestry Agent, was a hasty amendment to seed purchase legislation that was itself a part of an omnibus governmental spending bill.   The bill's language discloses the obvious cut-and-paste nature of the amendment:

> For purchase and distribution of new and valuable seeds and plants, sixty thousand dollars: *Provided*, That two thousand dollars of the above amount shall be expended by the Commissioner of Agriculture as compensation to some man of approved attainments, who is practically well acquainted with methods of statistical inquery, and who has evinced an intimate acquaintance with questions relating to the national wants in regard to timber to prosecute investigations and inqueries, with the view of ascertaining the annual amount of consumption, importation, and exportation of timber and other forest-product,

> the probable supply for future wants, the means best adapted to their preservation and renewal, the influence of forests upon climate, and the measures that have been successfully applied in foreign countries, or that may be deemed applicable in this country, for the preservation and restoration or planting of forests; and to report upon the same to the Commissioner of Agriculture to be by him in a separate report transmitted to Congress. For expense of putting up the same, for labor, bagging paper, twine, gum, and other necessary materials, five thousand dollars; in all, sixty five thousand dollars.

Act of August 15, 1876, 19 Stat. 143, 167. The Commissioner of Agriculture chose Hough, the author of the paper "On the Duty of Governments in the Preservation of Forests," as the "man of approved attainments" to become the first Forestry Agent. Steen at 7. In 1878, Hough forwarded to the Agricultural Commissioner and to Congress his comprehensive 650 page detailed report simply entitled, "Report on Forestry." So impressed was Congress with Hough's work that it authorized the printing of 25,000 copies for distribution. Steen at 5. In 1886, Congress made the "Division of Forestry" and its Chief a permanent part of the Department of Agriculture enabling the Commissioner[20] "to experiment and to continue an investigation and report upon the subject of forestry[.]" Act of June 30, 1886, 24 Stat. 100, 103.

---

[20] In 1889, the Commissioner of Agriculture became the Secretary of Agriculture when the Department of Agriculture was elevated to a Cabinet-level department. Act of February 9, 1889, 25 Stat. 659.

The second significant piece of federal forestry legislation, which also came about merely as an amendment to another bill, was the Forest Reserve Act. This bill, once signed into law, was known initially as the Act of March 3, 1891. Later it took its title as the "Forest Reserve Act" from an eleventh-hour amendment.

Following the Civil War, Congress passed many measures aimed at westward expansion, including land-grant laws. Two such laws, the Timber Culture Act of 1873 and the Homestead Act of 1873, while approved with the best of intentions, led to widespread fraud in their application. Steen at 18. In the midst of repealing the two offending 1873 statutes, and when the twenty-three section bill to bring about such repeal was in conference between the House and Senate, some member of Congress attached an amendment designated as a new section twenty-four. Without debating this new section, both bodies of Congress passed the bill and President Benjamin Harrison signed it into law. Section 24, the only section of the bill dealing with the reservation of forest land, and whose topic would later lend its name to the entire law, read:

> Sec. 24 That the President of the United States may, from time to time, set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the

President shall, by public proclamation, declare the establishment of such reservations and the limits thereof.

Act of March 3, 1891, ch. 561, 26 Stat. 1095, 1103 (herein the "Forest Reserve Act"). Congress thus delegated[21] to the President the power through proclamation to set aside "any part of the public lands wholly or in part covered with timber or undergrowth" as forest reservations. Conspicuously absent from the Forest Reserve Act was the creation of, or delegation to, any entity[22] to administer new forest reservations.[23] Nevertheless, President Harrison quickly went about reserving forest land, setting aside what is now the Shoshone and Bridger-Teton National Forests in Wyoming, within 30 days of signing the Forest Reserve Act. Steen at 8. In all, President Harrison reserved 13 million acres of western land and created 15 national forest reserves before leaving office. Id.

---

[21] Granting the President such proclamation power regarding timber was not new. Early in the nation's history Congress gave the President the power to select "vacant and unappropriated lands of the United States as produce live oak and red cedar" as may be necessary to furnish the navy "a sufficient supply of the said timbers." Act of March 1, 1817, 3 Stat. 347.

[22] The administration of the forest reserves found its home in the Department of Agriculture's Bureau of Forestry on February 1, 1905. 33 Stat. 628. One month later, on March 3, 1905, the Bureau of Forestry became the Forest Service. 33 Stat. 861, 872-23.

[23] "National forests" was substituted for "forest reservations" pursuant to the Act of March 4, 1907, ch. 2907, 34 Stat. 1256, 1269, which stated that "forest reserves … shall be known hereafter as national forests[.]"

President Harrison was succeeded by Grover Cleveland in 1893. Congress, meanwhile, faced with 15 new forest reserves and no administrator to manage them, allocated $25,000 to the National Academy of Sciences,[24] under the supervision of the Secretary of the Interior, to investigate and report "on the inauguration of a national forestry policy for the forested lands of the United States[.]"  Act of June 11, 1896, 29 Stat. 413, 432.  The NAS appointed six official members to its National Forest Commission, including Gifford Pinchot,[25] former forester for George

---

[24] The National Academy of Sciences is a Congressionally chartered corporation tasked, "whenever called upon by any department of the Government, [to] investigate, examine, experiment, and report upon any subject of science or art, the actual expense of such investigations, examinations, experiments, and reports, to be paid from appropriations which may be made for that purpose[.]" Act of March 3, 1863, § 3, 12 Stat. 806, 807.

[25] It is entirely fitting that these matters come before the Court in this District and, in particular, Asheville. The city of Asheville and its surrounding areas may genuinely be regarded as the "cradle of forestry" given the many contributions Asheville residents made to the national forest system.  In addition to his influential role as the secretary for the National Forest Commission, Pinchot was one of George Vanderbilt's foresters.  He would go on to become the first Chief of the Forest Service. Also, it was Pinchot who recommended to fellow Biltmore Estate forester, Carl Schenck, that the nation's first forestry school, the Biltmore School of Forestry, be established, which occurred on Vanderbilt's land in 1898.    Shelly S. Mastran and Nan Lowerre, Mountaineers and Rangers, at 13, USDA FS-380 (1983) available at http://books.google.com/books?hl=en&output=acs_help&id=WYI07H72zj0C (last accessed July 31, 2014) (herein "Mastran & Lowerre) (see Appendix).   Vanderbilt himself began negotiations with the federal government for the sale of some of his property for forest land. Following Vanderbilt's untimely death, his widow, Edith, sold nearly 87,000 acres to the federal government pursuant to the Weeks Forestry Act, discussed infra. This tract – later deemed the "cradle of forestry" – became the basis for the Pisgah National Forest in 1916, "the first national forest established in any eastern state from lands acquired under the Weeks Act."  The Forest History Society, The Weeks Act: Protection and Restoration, available at   http://www.foresthistory.org/ASPNET/Policy/WeeksAct/Implementation.aspx   (last acces-sed July 31, 2014) (see Appendix); Shands at 9. In 1898, Dr. George Ambler

Vanderbilt, as secretary, and John Muir, founder of the Sierra Club, as an ex-officio member.  Steen at 8.  The National Forest Commission issued a draft of its first report later that year to Secretary of the Interior David Francis recommending 13 new forest reserves in the western United States.  Gerald W. Williams and Char Miller, "At the Creation: The National Forest Commission of 1896-97," Forest History Today, Spring/Fall, 2005, at 37 (herein "Williams & Miller").  Secretary Francis conveyed this information to President Cleveland by letter dated February 6, 1897.  Id.  President Cleveland thereafter adopted the recommendation and reserved 13 new national forests, setting aside 21 million acres in western States with the stroke of his pen.  Id.  The President made this proclamation on February 22, 1897, days before leaving office, and these forests were later known as the "Washington's Birthday Reserves."  Id.

The outcry from federal legislators representing the western States was swift and furious.  Congressional opponents of the new forests

---

established the Appalachian National Park Association in Asheville. Percy J. Paxton, The National Forests and Purchase Units of Region Eight, unpublished manuscript at 3, The Forest History Society, 1955, available at http://www.foresthistory.org/Research/documents/ Paxton_National_Forests_and%20Purchase_Units.pdf (last accessed July 31, 2014) (herein "Paxton") (see Appendix).  The ANPA was instrumental in prompting Congress to fund a forestry study and survey of 9,600,000 acres of southern Appalachian forest land in 1900-01. Id. at 4. On January 16, 1901, U.S. Senator Jeter C. Pritchard of North Carolina, an Asheville resident, introduced one of the first bills in Congress to provide an appropriation for the Secretary of Agriculture to purchase "not less than 2,000,000 acres of mountain land" in six southern states as forest reserves.  Id.

attached a rider, repealing the proclamation, to the appropriations bill necessary to fund the government for the following year.  As his last act in office, President Cleveland vetoed that bill.   Steen at 32.

At the beginning of his presidency, William McKinley called a special session of Congress specifically to appropriate money to keep the government functioning since his predecessor vetoed Congress' funding measure. Id.  Congress thus began work on a new spending bill.  The third significant piece of federal forestry legislation came into being as an amendment to this bill. President McKinley, an advocate for forest reserves, called upon Pinchot and others to "work[ ] the congressional cloakrooms" in an effort to dissuade House and Senate members from repealing the Washington's Birthday Reserves proclamation. Id. at 34. Pinchot was successful – the Sundry Appropriations Act of 1897, now known for its important amendment as the "Forest Management Act," passed. To assuage the resentment of those Congressional members representing the western States, a compromise was reached regarding the original bill. The Washington's Birthday Reserves proclamation would not be repealed but only suspended for 9 months to provide for land surveys. Further, the amendment's last provision resulted in the "reserves being established for timber and water supplies, settlers having rights-of-egress,

mature timber being marked and designated, appraised, and sold at auction, and all water being used under State and Federal laws." Steen at 34. The critical provision of this part of the amendment stated:

> No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States[.]

The Forest Management Act of June 4, 1897, 30 Stat. 11, 35. "This one phrase established a system whereby new reserves could be created if they met three criteria: to protect and improve the forests, provide watershed protection, and insure timber production." Williams & Miller at 39.

Twenty years after passing the Forest Reserve Act, and ten years after North Carolina passed its 1901 enactment consenting to the federal government's future acquisition of its lands to become a national forest, Congress approved the first comprehensive national forest policy legislation, the Weeks Forestry Act. Act of Mar. 1, 1911, ch. 186, §§ 4-14, 36 Stat. 961, 962-3 (1911) (codified as amended at 16 U.S.C. §§ 480, 500, 515 to 519, 521, 552, and 563). Using the Forest Reserve Act, the Forest Management Act, and the NAS's National Forest Commission as templates, Congress fashioned the Weeks Act, establishing what was to

become the National Forest System. The Weeks Act created the National Forest Reservation Commission and gave the NFRC the responsibility of identifying and acquiring, with the Agriculture Secretary's permission, suitable land for national forests. Further, the Weeks Act tasked the Secretary of Agriculture with administering and regulating lands included within the forest system so acquired by the NFRC.[26] The Weeks Act, ch. 186, § 6, 36 Stat. at 962. In passing the Weeks Act, however, Congress imposed a condition precedent upon the federal government's supremacy power to acquire lands from the States for national forests: the legislature of the State in which the land lay must consent to its acquisition. The Weeks Act, ch. 186, § 8, 36 Stat. at 962.

Following Congress' passage of the Weeks Act in 1911, the Secretary of Agriculture, working through the NFRC, immediately began locating properties in western North Carolina to acquire on behalf of the United States as forest land, and then began acquiring such properties. Chief U.S. Forester at that time, Henry S. Graves, issued his "General

---

[26] It is important to recognize, in a very broad sense, how the national forest system framework operates with regard to the acquisition of public or private property for forestry purposes. Congress has granted the *President* the power to proclaim national forest boundaries and to reserve federal (public) lands within them pursuant to the Forest Reserve Act and the Forest Management Act. Congress has granted the *Secretary of Agriculture* (and until 1976 the NFRC) the power to acquire private land located within Presidentially-proclaimed national forest boundaries pursuant to the Weeks Act.

Information" on the purchase of land under the Weeks Act located in the Southern Appalachian Mountains and Northern White Mountains on March 27, 1911.[27] In 1912, the NFRC[28] approved approximately 590,000 acres in western North Carolina and northern Georgia for acquisition as the Nantahala Purchase Unit. <u>Report of the National Forest Reservation Commission for the Fiscal Year Ending June 30, 1912</u>, at 2 (herein "1912 NFRC Report"). On January 29, 1920, President Wilson proclaimed the creation of the Nantahala National Forest in parts of North Carolina, South Carolina, and Georgia. Proclamation No. 66 of January 29, 1920, 41 Stat. 1785 (1920). Sixteen years later, President Roosevelt established the NNF's general boundaries by proclamation on July 9, 1936. Proclamation No. 2185, 50 Stat. 1742 (1936). In 1950, Congress confirmed the boundary between the NNF and Great Smoky Mountain National Park as set forth in President Roosevelt's Proclamation No. 2185. Act of July 26, 1950 § (b), 64 Stat. 377, 378.

---

[27] Forester Graves' "General Information" can be found at http://www.foresthistory.org/ASPNET/Policy/WeeksAct/lands_1911.pdf (last visited July 31, 2014) (see Appendix).

[28] The NFRC was created in 1911 by the Weeks Act and was abolished in 1976 by the National Forest Management Act of 1976, Pub.L. 94-588, § 17(a)(1), Oct. 22, 1976, 90 Stat. 2949, 2960 ("Section 4 [of the Weeks Act], as amended, is repealed, and all functions of the National Forest Reservation Commission are transferred to the Secretary of Agriculture."). During its existence, the NFRC issued yearly reports of its activities. Any such report cited in this Order will be referred to as "19XX NFRC Report" where the variables "XX" shall represent the last two digits of the fiscal year ending June 30th for the specific NFRC report discussed.

1. *The Macon County Property at Issue in CR-15*

The Indictment in CR-15 alleges the site where the undersized bear was taken in violation of law was located in Macon County, North Carolina, on land within the NNF. [CR-15 Docs. 1; 82-1]. The Government has filed in this case [CR-15 Docs. 83-1; 83-2; 83-3] the record documents from two condemnation proceedings instituted in this Court by the Secretary of Agriculture in 1915 and 1916 pursuant to his authority under the Weeks Act. The description of these actions as being in the nature of condemnation proceedings is somewhat misleading. A careful reading of each of the two Petitions discloses that the Secretary of Agriculture initially identified the persons he believed to be the record land owners of the property sought, and thereafter negotiated with them directly to arrive at a sale price per acre for their land. However, due to the incomplete and confusing land registry in Macon County at that time, the Secretary joined as defendants any and all persons potentially holding a claim to the subject property. [CR-15 Doc. 83-1 at 40-4; CR-15 Doc. 83-3 at 28-31]. As such, these two actions more accurately represent proceedings to quiet title rather than resemble traditional hostile condemnation proceedings.[29]

---

[29] "[C]onfusions over land boundaries were one facet of another complicating factor. Many of the mountain people did not have clear title to their lands. Inheritance, previous sale of a portion of the land, and inadequate local recordkeeping all contributed to this

In paragraph 4 of each Petition, the Secretary particularly alleged that the State of North Carolina, pursuant to chapter 17 of the 1901 North Carolina Session Laws, consented to the acquisition by the government of the lands described in the Petitions. [CR-15 Doc. 83-1 at 34; CR-15 Doc. 83-3 at 24]. All parties, therefore, were on express notice of the North Carolina statute by which the federal government sought to obtain the property, and thus the parties were on notice of the homestead exemption contained therein. Critically, all of the Answers filed in each proceeding admit these allegations in the Petitions. [CR-15 Doc. 83-1 at 57; 77; CR-15 Doc. 83-2 at 3; 14; 39; 41; 43; CR-15 Doc. 83-3 at 47; 49; 52]. No person, in any Answer filed in either proceeding, asserted that any portion of the property sought to be acquired by the federal government was exempt under the homestead provision of chapter 17, section 2, of the 1901 North Carolina Session Laws.[30]  In each proceeding, this Court ultimately entered a final decree adjudging the United States to be the fee simple owner of the property described therein.  [CR-15 Doc. 83-2 at 47-9; CR-15 Doc. 83-3 at

_____

problem. A landowner often wished to sell land with title defects. Since the Government could not acquire the land unless the title could be cleared, this had to be done by 'friendly' condemnation."   Mastran & Lowerre at 58.

[30] While no North Carolina land owner raised as an affirmative defense, counter claim, or otherwise, the homestead provision of chapter 17, section 2, of the 1901 North Carolina Session Laws, one Answer did raise the statute of limitations in an unsuccessful bid as an affirmative defense. [CR-15 Doc. 83-1 at 57].

100-02]. This property encompasses that portion of the NNF at issue in the CR-15 case pertaining to the taking of the undersized bear. Defendants, however, persist in their claims that the Court lacks subject matter jurisdiction.

At the hearing held by the Court on March 24, 2014, the defendants produced an "Exchange Deed" [CR-15 Doc. 95-2] dated August 21, 1991, evidencing the exchange and transfer of properties between the federal government on the one hand, and Dabney Manning, Edwin Poss, and Mary Poss, on the other hand. In particular, the Exchange Deed describes NNF property conveyed by the federal government to these private persons in return for the receipt of their lands in North Carolina's Madison and Jackson Counties. Defendants asserted during the hearing that the undersized bear kill site was located on the property conveyed by the United States pursuant to the Exchange Deed, and thus the alleged offense occurred on private land. In response, the Government produced a survey plat [CR-15 Doc. 95-4] and National Forest Service map [CR-15 Doc. 95-1] indicating that the undersized bear unlawfully taken was not killed on any of the parcels referenced in the Exchange Deed and therefore was within the NNF. Defendants reply, in their supplemental filings [CR-15 Docs. 92-1; 94], that the Government's plat is inaccurate in that, except for

two calls, "[a]ll the other calls set forth on this [plat] that the Government produced does [sic] not correspond to the meets and bounds description set forth in the [Exchange D]eed." [CR-15 Docs. 92-1 at 6; 94 at 6]. The defendants' argument in this regard fails for two independent reasons.

First, the Government's plat is, in fact, consistent with all of the calls set forth in the Exchange Deed. The plat, which shows the United States' conveyance of certain acreage out from forest service tracts N-510, S-31G-5, and S-17, shows many individual "corners" and lists both the new and old alphanumeric labels for each such "corner." The defendants' assertion that the Government's plat is inaccurate when compared with the calls contained in the Exchange Deed is incorrect and stems from the defendants confusing an old corner designation on the Government's plat with a new corner label in the Exchange Deed. For example, the Exchange Deed, on page seven, refers in the last paragraph to "CORNER 2C, a new corner (designated as corner 8e of USA tract N-510)[.]" [CR-15 Doc. 95-2 at 7]. When one carefully compares this call to the plat, one can see that the corner now labeled as "2C" is also the same corner formerly designated as "8e." Following the calls from the Exchange Deed by tracing the newly labeled corners as set forth on the survey plat leads one correctly around the external boundary of the property so conveyed according to the metes

and bounds descriptions. Therefore, the Government's plat is consistent with all of the calls set forth in the Exchange Deed.

Second, and more importantly, the defendants' argument on this point is not a jurisdictional argument at all. In asserting that the bear was killed on private property, they are arguing that the Government will be unable to meet its burden of proof at trial as to one element of the crimes charged. The crimes charged, for which the grand jury found probable cause, involved the bear being killed on NNF property. Whether the Government can prove its case beyond a reasonable doubt is another matter altogether. The Government shoulders the ultimate burden of proving beyond a reasonable doubt that the geographical location of the kill site was within the NNF. If the Government prevails in its proof, it will have shown that the undersized bear was taken on federal forest land under the concurrent jurisdiction of the United States and North Carolina. If the Government fails in proving this element, the defendants are entitled to be acquitted. The geographical location of the kill site, therefore, has no bearing on the Court's subject matter jurisdiction.

Finally, the Court turns to the issue of the federal government's authority to legislate regarding activity taking place on Macon County NNF lands. Though the federal government may become seized in fee simple of

real property it acquires which is situated within North Carolina, its status as record title holder does little to define its power over such land due to the comity issues inherent in federalism. North Carolina retained concurrent jurisdiction over the lands within its borders when it ceded to the federal government jurisdiction over the Macon County lands later to become the NNF in accordance with North Carolina's 1901 enabling legislation. Because the federal government purchased the Macon County property that was to become NNF lands from the citizens of North Carolina, the power of the federal government over these NNF lands is determined by N.C. Gen. Stat. § 104-5. Since the federal government purchased this land from private property holders, taken together with the State's affirmative cession of some of its legislative authority (as opposed to the federal government acquiring land from a foreign nation by conquest or treaty[31]), the Enclave Clause establishes the extent of the federal government's jurisdiction in accord with the State's law.

As for the federal government's jurisdiction over the NNF lands at issue in Macon County and acquired pursuant to N.C. Gen. Stat. § 104-5, the federal government enjoys concurrent jurisdiction with North Carolina

---

[31] The Property Clause of the Constitution generally addresses Congress' jurisdiction over lands the government acquires in the first instance. U.S. Const. art. IV, § 3, cl 2 ("Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. ...").

consistent with the Supreme Court's interpretation of the Enclave Clause. It is irrelevant whether the federal government's acquisition of these lands occurred before or after February 1, 1940, for the purpose of determining whether the federal government accepted jurisdiction. The federal government's acceptance of jurisdiction with the jurisdictional limitations as set out in North Carolina's 1901 Act was either implicit or explicit. As for the Macon County property the federal government acquired before February 1, 1940, the federal government was deemed to have implicitly accepted such jurisdiction and jurisdictional limitations as offered by a State in conjunction with its residents' conveyance of property. <u>Lowe</u>, 114 U.S. at 528. As for the NNF property acquired federally after that date, the Secretary of Agriculture complied with 40 U.S.C. § 3112(b) by mailing a letter to then-Governor of North Carolina, Michael Easley, dated December 30, 2008, accepting concurrent jurisdiction over all land acquired in North Carolina for national forest purposes. [CR-15 Doc. 82-5]. Either way, both the United States and North Carolina enjoy concurrent jurisdiction over NNF lands so acquired in Macon County, North Carolina, at issue herein.

     D.    <u>The Tennessee Valley Authority</u>

     Gifford Pinchot's contribution to the development, use, and management of the nation's resources was not limited to the single

dimension of forestry stewardship. He viewed timber production, commerce by inland waterways, and power generation, along with erosion control, flood abatement, and anti-sedimentation measures, not as isolated issues but as separate parts of a large puzzle whose correct assembly lay in understanding the interconnectedness of the pieces. Gifford's prescience about these matters would portend the creation of the Tennessee Valley Authority.

> When private power interests were trying to take over the federally owned hydroelectric plant in Muscle Shoals, Alabama, President Roosevelt stepped in and saved it for public use. Later his administration undertook a major effort to prevent erosion and to develop transportation on regional waterways with the help of government-planned engineering projects. All of it was based on a new idea: that the only way to approach any water issue—whether flood control, hydroelectric power, erosion, or the preservation of fish and game—was to look at a river system as a whole, from the sources to the mouth.
>
> If that sounds like TVA, well, it's no coincidence. But this President Roosevelt was a Republican, and his name wasn't Franklin but Theodore. Teddy Roosevelt proposed these projects almost 100 years ago, largely because of the influence of his visionary chief forester, Gifford Pinchot. If Pinchot wasn't the godfather of TVA (most historians would give that honor to George Norris), he'd have to be considered something like its prophet.

The Tennessee Valley Authority, "A Complicated Unity," available at **Error!**

**Hyperlink reference not valid.** (last accessed July 31, 2014) (see Appendix).

Approximately twenty-five years after President Theodore Roosevelt's term expired, President Franklin D. Roosevelt set about to launch a great experiment in America's Tennessee Valley. In the midst of a national depression with few jobs but abundant labor, and recognizing the plight of southern Appalachian farmers working land stripped of nutrients, President Franklin Roosevelt proposed the creation of a quasi-governmental corporation or "Authority" with a name taken from the place it sought to aid.

> Roosevelt envisioned TVA as a totally different kind of agency. He asked Congress to create a corporation clothed with the power of government but possessed of the flexibility and initiative of a private enterprise. On May 18, 1933, Congress passed the TVA Act.[32]

The Tennessee Valley Authority, "From the New Deal to a New Century," available at http://www.tva.com/abouttva/history.htm (last accessed July 31, 2014) (internal quotations omitted) (see Appendix). "[I]n the interest of the national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood water in the Tennessee River and Mississippi River Basins," Congress created, and the President signed, legislation establishing "a

---

[32] The Tennessee Valley Authority Act of 1933, 48 Stat. 58, codified at, 16 U.S.C. § 831, et seq.

body corporate by the name of the 'Tennessee Valley Authority[.]' " 16

U.S.C. § 831.

> From the start, TVA established a unique problem-solving approach to fulfilling its mission: integrated resource management. Each issue TVA faced — whether it was power production, navigation, flood control, malaria prevention, reforestation, or erosion control — was studied in its broadest context. TVA weighed each issue in relation to the whole picture.

The Tennessee Valley Authority, "From the New Deal to a New Century,"

available at http://www.tva.com/abouttva/history.htm (last accessed July

14, 2014) (internal quotations omitted) (see Appendix). The "especial"

purpose of the TVA was to bring about:

> (1) the maximum amount of flood control; (2) the maximum development of said Tennessee River for navigation purposes; (3) the maximum generation of electric power consistent with flood control and navigation; (4) the proper use of marginal lands; (5) the proper method of reforestation of all lands in said drainage basin suitable for reforestation; and (6) the economic and social well-being of the people living in said river basin.

16 U.S.C. § 831v. To fulfill its charter, the TVA was granted broad

"necessary and appropriate" powers. 16 U.S.C. § 831c(g). These powers

enabled the TVA to acquire property in the name of the United States from

States' residents, including the power of eminent domain, to build dams,

create reservoirs, and construct power houses among other things. 16

U.S.C. § 831c(h). As time went on, such powers were also granted the

TVA to convey all or any lesser interest in real property by deed, lease, or otherwise, as well as to transfer the possession and control over any such real property to other persons or entities. 16 U.S.C. § 831c(k).

### 1.    *The Graham County Property at Issue in CR-16*

The Indictment in CR-16 alleges the sites where black bear and white tail deer were taken in violation of law were located in Graham County, North Carolina, on land within the NNF. [CR-16 Doc. 1]. The Government has filed in this case [CR-16 Docs. 91-1; 91-2] Forest Service maps depicting the areas within the NNF where the defendants are alleged to have taken wildlife unlawfully. In their written memoranda, and at the hearing held by the Court on May 29, 2014, the defendants argued that the alleged wildlife kill sites in Graham County occurred on three different parcels of land within the NNF and known as: (1) tract "N-1073e," (2) tract "TVA-1," and (3) the TVA land between the 1710-foot contour and the low water mark of the TVA Fontana Lake Reservoir (herein the "Shoreline Strip").[33]  The Court will discuss the federal government's jurisdictional authority over each of these three parcels in turn.

---

[33] These three parcels are, in essence, lands surrounding Lake Fontana and can be roughly defined by their elevations. Beginning with the lowest parcel, the Shoreline Strip, that parcel is the land between the low-water mark of the lake and the 1710' contour (usually the high-water mark).  Tract TVA-1 is the land between the 1710' contour and the lower boundary of tract N-1073e, which ranges from the 1723' contour in places to above the 2000' contour in other places. Tract N-1073e is, for the most part,

(a)     Tract N-1073e

The defendants contend that tract N-1073e, while located entirely within the external boundaries of the NNF, is not property the federal government acquired pursuant to the Weeks Act, and therefore has no legislative authority over it.  They alleged in their initial written filings that the Government provided no documentation to them showing that the NFRC passed upon the federal government's purchase of tract N-1073e for inclusion within the NNF.  Following the defendants' initial filings, the Government obtained, and disclosed to the defendants, additional land records concerning this tract.  [CR-16 Docs. 115; 116]. These records disclose the following information.  On May 13, 1947, Whiting Manufacturing Company executed a Land Purchase Option and Contract in favor of the USDA's Forest Service, on behalf of the United States, offering to sell some 28,117 acres in Graham, Swain, and Cherokee Counties, North Carolina to the federal government.  [CR-16 Doc. 116-1 at 2].  This offer was conditioned upon the NFRC's approval of the property for forest land.  [Id.]  The NFRC approved the purchase of this property on May 20, 1947, and directed that surveys of the same be made. [Id. at 6].  Following the Forest Service's surveys, Whiting Manufacturing Company conveyed in

that land above the elevation of tract TVA-1.

fee by deed to the United States the 24,680 acres of property it owned in Graham County, North Carolina, on December 17, 1948. [CR-16 Doc. 115-1]. This conveyance included tract N-1073e. [Id. at 22-26]. Finally, NFRC Reports for years 1948 and 1949 reflect that this property was approved for purchase by the NFRC, was purchased in 1948, and appeared on the 1949 NFRC Report as additional acreage that was purchased in Graham County, North Carolina, beyond the acreage listed in the 1948 NFRC Report. The defendants' argument that tract N-1073e was not acquired pursuant to the Weeks Act thus fails.

Given that the federal government's purchase of tract N-1073e complied with the Weeks Act, the legal analysis concerning the federal government's legislative authority of tract N-1073e mirrors that of the Macon County property at issue in case CR-15, discussed above in Part I.C.1. Because the federal government purchased tract N-1073e from Whiting Manufacturing Company, N.C. Gen. Stat. § 104-5 determined the power the federal government received over this parcel as NNF land. Section 104-5 in conjunction with the Enclave Clause, permits the federal government to exercise concurrent jurisdiction with North Carolina over this land provided the federal government accepts such authority. Since tract N-1073e was purchased after February 1, 1940, explicit acceptance of

jurisdiction is required. The federal government did so when the Secretary of Agriculture complied with 40 U.S.C. § 3112(b) by mailing a letter to then-Governor of North Carolina, Michael Easley, dated December 30, 2008, accepting concurrent jurisdiction over all land acquired in North Carolina for national forest purposes. [CR-15 Doc. 82-5]. This Court, therefore, has subject matter jurisdiction over the offenses alleged by the Government against the defendants occurring on tract N-1073e.

(b)     Tract TVA-1.

The facts concerning Tract TVA-1 are more complex. This tract was originally purchased by the federal government in December 1942 to be included within the lands of the TVA. It was part of numerous properties in Graham and Swain Counties that were purchased from the Aluminum Company of America and its subsidiaries Carolina Aluminum Company and Nantahala Power and Light Company (herein collectively "ALCOA"). [CR-16 Doc. 105-4]. In September 1946, the TVA Board of Directors authorized the transfer of 5,803 acres of this property to the management of the USDA's Forest Service (which included lands forming tract TVA-1) for inclusion into the NNF. [CR-16 Doc. 105-5 at 2]. The TVA's transfer of its authority over land including the TVA-1 tract to the USDA was consummated by a written Agreement of Transfer dated February 24,

1947.  [CR-16 Doc. 80].  As required by 16 U.S.C. § 831c(k)(*c*), President Truman approved this transfer.[34]  [CR-16 Doc. 80 at 5].

In analyzing what jurisdiction and authority the federal government has over tract TVA-1, it must first be determined whether TVA's transfer to the Forest Service was, in fact, an "acquisition by the United States by purchase or by condemnation . . . for the establishment of . . . a national forest reserve."  N.C. Gen. Stat. § 104-5.  If it was, then N.C. Gen. Stat. § 104-5 governs the federal government's authority.  If not, then N.C. Gen. Stat. § 104-7 governs based on the 1942 acquisition by the TVA on behalf of the United States.

The documentary record makes the answer quite clear.  The United States neither purchased nor condemned tract TVA-1 in 1947.  It simply effectuated a transfer of authority over the property from one governmental unit to another.  There is only one deed to the United States of America: the deed from ALCOA to the United States in December 1942. Hence, N.C. Gen. Stat. § 104-5 is inapplicable and the jurisdictional analysis is governed by N.C. Gen. Stat. § 104-7.

Before addressing how § 104-7 applies, the defendants argue that the land transfer between the TVA and the Forest Service was invalid

---

[34] See, infra, footnote 35.

because the federal government did not advertise the transfer properly or comply with other requirements. Defendants cite to 16 U.S.C. § 516, 43 U.S.C. § 1716, and 36 C.F.R. parts 254.1 and 254.2 in support of their argument. All of these laws, however, apply only when the federal government *exchanges property with another land owner*, not when the government internally transfers supervisory authority over property from one department to another. The undisputed record in this case shows that the TVA made a valid transfer of authority over tract TVA-1 to the Forest Service.[35] The defendants' arguments in this regard, therefore, are without merit.

---

[35] 16 U.S.C. § 831c(k) states, in the two relevant subparagraphs, that the TVA shall have power in the name of the United States: "*(a)* to convey by deed, lease, or otherwise, any real property in the possession of or under the control of the Corporation to any person or persons, for the purpose of recreation or use as a summer residence, or for the operation on such premises of pleasure resorts for boating, fishing, bathing, or any similar purpose" … *(c)  And provided further*, That no transfer authorized herein in *(a)* or *(c)* … shall be made without the approval of the President of the United States, if the property to be conveyed exceeds $500 in value[.]"  Neither the Board's minutes regarding that authorization, nor the Agreement of Transfer, cited the specific subsection of 16 U.S.C. § 831c(k) upon which the transfer was premised.  [Id.]. Correspondence between counsel for the TVA and the USDA established that the authorization for the transfer was made pursuant to subparagraph (a) of 16 U.S.C. § 831c(k), citing the property's future use for purposes of "recreation."  [CR-16 Docs. 105-6, 105-7, and 105-8].  The TVA, prior to its intended land transfer to the USDA, previously had invoked § 831c(k)(a) when transferring 44,400 acres to the Department of the Interior for use in the Great Smoky Mountain National Park. [CR-16 Doc. 105-8 at 2].  The mechanism for the land transfer between the TVA and the Department of the Interior – 16 U.S.C. § 831c(k)(*a*) – was approved by the then-acting Solicitor General. [CR-16 Doc. 105-8].  The TVA used this precedent as a basis for making its transfer of tract TVA-1 to the Forest Service.

The defendants also argue that since North Carolina did not consent to the TVA transferring its lands to the USDA, such transfer is invalid. Defendants, however, cite no authority for the proposition that the federal government, as fee simple owner of lands situated within a State, must obtain that State's permission in order to transfer administrative authority over such lands from one federal department to another.

Since the federal government affected a lawful transfer of authoritative control over tract TVA-1 between departments, the Court turns to the legal analysis concerning the federal government's legislative authority over tract TVA-1. At the time the TVA purchased the lands which constitute tract TVA-1, N.C. Gen. Stat. § 104-7 granted the federal government the authority to acquire by purchase, pursuant to the Enclave Clause, "any land in the State required for customhouses, courthouses, post offices, arsenals, or other public buildings whatever, or **for any other purposes of the government**." Id., emphasis added. Clearly, TVA's acquisition of tract TVA-1 for flood control, power generation, and reforestation, met the requirements of land to be used "for any other purposes of the government." Use as Forest Service land is likewise a proper governmental purpose.

Defendants argue that, even if § 104-7 permitted the TVA to acquire tract TVA-1, the grant of jurisdiction over that tract was never effectuated pursuant to that section. Since tract TVA-1 was acquired by the federal government in 1942, the grant of jurisdiction from the state must be expressly accepted by the federal government for it to be effective. 40 U.S.C. § 3112(b). The federal government did not expressly accept such jurisdiction with regard to TVA-1 until December 30, 2008, when the Secretary of Agriculture wrote to the Governor of North Carolina:

> This letter constitutes the United States' acceptance of concurrent legislative jurisdiction over all land acquired in North Carolina for national forest purposes, including land acquired in the future. To avoid future jurisdictional disputes as to particular land or factual situations, **this acceptance should be read to encompass all national forest lands in North Carolina, at whatever time they may have been acquired** (before or after February 1, 1940) or may in the future be acquired.

[Doc. 82-5 (emphasis added)].

The version of N.C. Gen. Stat. § 104-7 in effect in 1942 read as follows:

> The consent of the State is hereby given, in accordance with the [Enclave Clause], to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in the State required for the sites for customhouses, courthouses, post offices, arsenals, or other public

> buildings whatever, **or for any other purposes of the government**.
>
> Exclusive jurisdiction in and **over any land so acquired** by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State[.]

N.C. Gen. Stat. § 104-7 (2002) (emphasis added).  In 2005, however, N.C. Gen. Stat. § 104-7 was amended to eliminate the authorization for acquisition and transfer of jurisdiction for "any other purposes of the government."  Since this occurred before the federal government accepted jurisdiction over TVA-1, the defendants argue that the 2008 acceptance was ineffective and the federal government therefore has no authority over tract TVA-1.

The defendants' argument is belied by the language of both the old and new versions of N.C. Gen. Stat. § 104-7.  The original version of § 104-7 stated that "consent of the State is hereby given . . . to the acquisition . . . of any land," and that "[e]xclusive jurisdiction in and over any land **so acquired** . . . is hereby ceded to the United States . . . ."  (Emphasis added).  The 2005 version reads very similarly.  Particularly with regard to the grant of jurisdiction, it reads: "Exclusive jurisdiction in and over any land acquired by the United States . . . under subsection (a) of this section is

hereby ceded . . . ." Id.  In other words, both the old and new versions of the statute set forth two distinct grants of authority: a grant to acquire land, and a grant of jurisdiction over land *so acquired*.[36]  The operative date for both grants is the date of the land acquisition.  In 1942, the federal government was authorized to acquire tract TVA-1 and the State of North Carolina extended a grant of jurisdiction over that parcel as well.  That grant of jurisdiction – as tendered in 1942 – was never revoked and was formally accepted in 2008.  The new version of § 104-7, by its terms, applies only to lands acquired by the federal government after 2005, and thus is irrelevant to this analysis.  The defendants have not, and cannot, point to any language in the 2005 version of the statute that states or implies that the adoption of these later amendments worked a withdrawal of the State's grant of jurisdiction from the statute as it existed in 1942.

As discussed above at footnote 26, the Weeks Act is not the only means by which real property may become part of the National Forest System.  The other method is by presidential proclamation. Whether the land is public or private land at the time of its inclusion in the National

---

[36] It is in this way – by providing two distinct grants of authority – that the North Carolina General Assembly drafted the original version of § 104-7 in a manner quite consistent with the original version of § 104-5. In the original version of what was to become § 104-5, North Carolina granted the federal government the right to acquire North Carolina property in Section 1, and in Section 2 it granted Congress the authority to "pass such laws as it may deem necessary to the acquisition" of such property. 1901 N.C. Sess. Laws, ch. 17.

Forest System determines the procedure.  If the land is private, the Weeks Act grants the Secretary of Agriculture (and until 1976 the NFRC) the power to acquire land held by private parties.  If, however, the land is already in public hands, Congress grants the President the power to reserve and set aside federal lands for forest purposes pursuant to the Forest Reserve Act and the Forest Management Act.

The TVA purchased tract TVA-1 in accordance with N.C. Gen. Stat. § 104-7 in 1942 and the United States became the fee simple owner of the property at that time.   In 1947, the TVA transferred authority and control over tract TVA-1 to the Department of Agriculture as forest land and, in approving the transfer, President Truman also proclaimed that this public land "be allocated to and included in and reserved as a part of the Nantahala National Forest" pursuant to the Forest Reserve Act and the Forest Management Act.    [CR-16 Doc. 80 at 5].    The President's proclamation transformed the use to be made of the land: it was originally acquired "for any other purposes of the government" under § 104-7, but was then set aside as lands needed for the establishment of a national forest reserve.  Tract TVA-1, having been so reserved by the President in 1947, became subject to the legislative authority of both the federal government and the State of North Carolina upon the filing of the Secretary

65

of Agriculture's general acceptance letter with the North Carolina Governor's office in 2008. Upon the filing of that letter, the federal government became fully vested with concurrent jurisdiction over tract TVA-1. This Court, therefore, has subject-matter jurisdiction over the offenses alleged by the Government occurring on tract TVA-1.

(c)   The Shoreline Strip

The federal property below the 1710-foot contour and above the low water mark of Fontana Lake – the Shoreline Strip – is still controlled, managed, and administered by the TVA. The Shoreline Strip resides well within the external boundary of the NNF.[37] The defendants contend, as to any illegal taking of wildlife occurring within the boundary of the NNF but on the Shoreline Strip administered by the TVA, that the United States has no jurisdiction to enforce Forest Service hunting regulations. The Fourth Circuit, in United States v. Stephenson, 29 F.3d 162 (4th Cir. 1994), rejected a similar claim regarding the hunting of wildlife on TVA lands but within the external boundary of the Great Smoky Mountains National Park

---

[37] Because the NNF's external boundary was established before the TVA dammed the Tuckasegee and Little Tennessee Rivers, its precise location is currently off-shore and underwater. The northern boundary between the NNF and the Great Smoky Mountains National Park originally followed the "meanders of the left bank of Tuckasegee River" before that area was flooded. United States v. Stephenson, 29 F.3d 162, 164 (4th Cir. 1994). Thus, the NNF boundary lies beyond the Shoreline Strip within the waters of Fontana Lake.

(i.e., on the opposite shore of the lake).  Stephenson, 29 F.3d at 165.  For the reasons that follow, the history surrounding the acquisition of the TVA property together with the rationale underlying the Stephenson decision prevent the Court from accepting the defendants' argument. [38]

As explained in the preceding section regarding tract TVA-1, lands encompassing the Shoreline Strip were originally purchased by the federal government for the benefit of the TVA consistent with the TVA Act. Because they were purchased in the name of the United States "for any [ ] purposes of the government[,]" these lands were acquired in accordance with N.C. Gen. Stat. § 104-7.  When the TVA later transferred tract TVA-1 to the management of the USDA's Forest Service in 1947, it omitted from such transfer the land described herein as the Shoreline Strip, presumably because that strip is occasionally under the water of a TVA reservoir.  [CR-16 Doc. 105-5 at 2].  Defendants, therefore, argue that the State of North Carolina never granted concurrent or exclusive jurisdiction to the United States for property acquired by the TVA and lying in the "no man's land" of the Shoreline Strip. The analysis on this issue is almost identical to that

---

[38] The defendants' argument that the Court is without jurisdiction to preside over the charges they face stemming from their alleged activities occurring on the Shoreline Strip would produce an anomalous result.  If the defendants' argument were correct, then a violation of State wildlife law on the south shore of Fontana Lake between the 1710' contour and the low-water mark would not be a violation of federal law while the same State wildlife law violation on the same strip of land on the north shore of Fontana Lake is a federal violation according to Stephenson.  Surely this is not the law.

pertaining to tract TVA-1, <u>supra</u>, except that the acceptance of jurisdiction was effectuated before the 2005 amendments to N.C. Gen. Stat. § 104-7.

In 1942, the federal government was authorized by the State of North Carolina to acquire the lands that make up the Shoreline Strip, and the State extended a grant of jurisdiction to the federal government over that parcel; the actions of both sovereigns in this regard were fully consistent with N.C. Gen. Stat. § 104-7.  The State's grant of jurisdiction, as tendered in 1942, was never revoked by the State and was formally accepted by the federal government in 2001.  On December 31, 2001, the United States, acting by and through the TVA, and the State of North Carolina, acting by and through its Governor, entered into a "Memorandum of Agreement for Concurrent Jurisdiction at Tennessee Valley Authority Units within the State of North Carolina." [CR-16 Doc. 105-11].  That agreement specifically states its purpose is for the federal and state governments to "develop a uniform system of concurrent jurisdiction for all areas of the TVA within the State of North Carolina."  <u>Id.</u> at 1].  Among the recitals of that agreement, the parties note that the State "has ceded to the United States jurisdiction of TVA lands held in the name of the United States Government and/or TVA subject to the conditions set forth in" § 104-7.  <u>Id.</u>].  This Memorandum was a mechanism whereby the State of North Carolina and

the federal government agreed that the two governments would have concurrent jurisdiction over all TVA real property (i.e., all "units" and all "lands") in North Carolina.  [Id. at 2]. That goal was accomplished by the State's granting concurrent jurisdiction over such "units" and by the federal government's retroceding its "exclusive jurisdiction" (originally ceded by the State pursuant to § 104-7) over such "lands" so that both sovereigns enjoyed concurrent jurisdiction over all TVA property.  Finally, the federal government manifested its affirmative intention to accept jurisdiction consistent with federal law.  The Memorandum, signed by then-Governor of North Carolina Michael Easley, explicitly complied with 40 U.S.C. § 255 (now 40 U.S.C. § 3112(b)) by affirmatively stating that the United States accepted North Carolina's cession of jurisdiction over the TVA land which included the Shoreline Strip.  [CR-16 Doc. 105-11 at 2].  Hence, the TVA can exercise concurrent jurisdiction with the State of North Carolina over all TVA property situated in that State.

The defendants argue further, however, that the *TVA's* jurisdiction over the Shoreline Strip says nothing at all about whether the *Forest Service* can exercise jurisdiction over the same land.  But this argument ignores the provisions of the Agreement to Transfer executed between the TVA and the USDA's Forest Service. As explained in the preceding section

regarding tract TVA-1, the TVA's transfer of its authority over land including the TVA-1 tract to the Forest Service was consummated by the Agreement of Transfer dated February 24, 1947. [CR-16 Doc. 80]. When the TVA transferred its authority over tract TVA-1 to the Forest Service, it also granted the Forest Service certain powers with regard to the Shoreline Strip. In particular, the TVA granted the Forest Service the right to access and to use the land lying between tract TVA-1 "and the low-water mark on Fontana Lake" for construction and maintenance purposes and for "performing all other acts which may be reasonably necessary to the administration and use, as part of the Nantahala National Forest as herein provided, of the lands described in [tract TVA-1]." [Id. at 2]. While not transferring its authority over the Shoreline Strip to the Forest Service, the TVA clearly granted the Forest Service broad supplemental authority to access the Shoreline Strip for all reasonable purposes necessary to administer and to use tract TVA-1. Enforcing game laws and regulations on the Shoreline Strip to protect wildlife inhabiting tracts N-1073e and TVA-1 clearly falls within the powers granted to the Forest Service by the TVA under this provision of the Agreement of Transfer. This conclusion is unremarkable. When addressing the jurisdiction of the National Park

Service under similar circumstances, the court of appeals in Stephenson stated:

> NPS jurisdiction over the northern shore of Fontana Lake is necessary to protect Park animals that must pass through portions of the Park in TVA's custody that lie below the 1710-foot contour line in order to reach the lake water. Were we to hold that NPS cannot enforce Park laws on the north shore of Fontana Lake, hunters could easily circumvent the protections for Park wildlife by waiting for Park animals to approach the lake waters before shooting them. This would frustrate the purpose for which the national park system was established.

Id., 29 F.3d at 165. The Forest Service possesses broad supplemental authority over the Shoreline Strip to enforce game laws and regulations consistent with its authority over forest lands contained within the external boundary of the NNF. The Court concludes, therefore, that the TVA enjoys concurrent jurisdiction over the Shoreline Strip, and the Forest Service enjoys like jurisdiction over the Shoreline Strip to the extent required for all reasonable purposes necessary to administer and use tract TVA-1, which includes enforcing game laws and regulations on the Shoreline Strip to protect wildlife inhabiting tracts N-1073e and TVA-1. As a result, this Court has subject-matter jurisdiction over the offenses alleged by the Government against the defendants occurring on the federal property lying below the 1710-foot contour and above the low water mark of Fontana Lake controlled, managed, and administered by the TVA.

E.    The Regulation and Statute Alleged to Provide Jurisdiction

   The final issue confronting the Court is whether the alleged unlawful acts of the defendants fall within the purview of the jurisdictional regulation and statute cited in both Indictments, to wit, 36 C.F.R Part 261.8(a) and 18 U.S.C. § 13.   Beginning first with the federal regulation, Part 261.8(a) prohibits, in pertinent part, any hunting in violation of State law which "occurs in the National Forest System or on a National Forest System road or trail." 36 C.F.R Part 261.1(a)(1).   The "National Forest System" is defined by 36 C.F.R Part 261.2 as "all national forest lands and waters reserved or withdrawn from the public domain of the United States, [and] national forest lands and waters acquired through purchase, exchange, donation, or other means[.]"  Accordingly, 36 C.F.R Part 261.8(a) provides the Court jurisdiction to preside over the unlawful acts alleged to have occurred on the Macon County property at issue in CR-15 as well as the unlawful acts alleged to have occurred on the N-1073e tract at issue in CR-16 since these two properties were acquired through purchase by the United States.  A forceful, if not decisive, argument can be made that tract TVA-1 at issue in CR-16 would fall under the National Forest System definition of Part 261.2 since that tract was "reserved or withdrawn from the public domain."  However, the reservation of tract TVA-1 as forested land

came about after the federal government's purchase of that property for TVA-related purposes, not Forest Service purposes.  But, the reservation of that land was also preceded by a transfer of authority and control granted by the TVA to the Forest Service.  Any uncertainty about whether the Court has jurisdiction to preside over the unlawful acts alleged to have occurred on tract TVA-1 evaporates, upon closer inspection of the regulations, because 36 C.F.R Part 261.1(a)(2) gives the Court authority to hear any hunting case alleged to violate State law that "affects, threatens, or endangers property of the United States administered by the Forest Service." Id.  The Court, therefore, may properly exercise its jurisdiction to hear the allegations that defendants committed unlawful acts on the Macon County property at issue in CR-15 as well as on the Graham County tracts N-1073e and TVA-1 at issue in CR-16.

The Court's authority to preside over a trial alleging unlawful acts occurring on the Shoreline Strip at issue in CR-16 cannot be sustained under 36 C.F.R Part 261.8(a). That regulation only applies to National Forest System lands, which definition excludes the Shoreline Strip since that property was acquired by the United States for the benefit of the TVA. The Court nevertheless has jurisdiction under 18 U.S.C. § 13.  Section 13, commonly referred to as the Assimilated Crimes Act, gives federal courts

jurisdiction to hear offenses committed in violation of State law that occur on land "reserved or acquired as provided in section 7 of this title[.]" Section 7(3), in turn, tracks the language of the Enclave Clause thus establishing federal jurisdiction over lands acquired by the federal government consistent with that Clause. Clearly, the TVA's Shoreline Strip is "Enclave" property: the federal government acquired the land pursuant to N.C. Gen. Stat. § 104-7 and accepted concurrent jurisdiction pursuant to 40 U.S.C. § 255 (now 40 U.S.C. § 3112(b)). The Court may properly exercise its jurisdiction to hear the allegations that defendants committed unlawful acts on the Shoreline Strip in Graham County at issue in CR-16.

In sum, the alleged unlawful acts of the defendants fall within the purview of the jurisdictional regulation and statute cited in the indictments and the Court, therefore, has jurisdiction to preside over the trials in these two cases for such offenses.

## II.     Subject Matter Jurisdiction Under The Lacey Act

The defendants' second contention is with regard to the Lacey Act counts in each Indictment. Specifically, the defendants argue that the Government cannot show any allegedly unlawful activities affected interstate or foreign commerce and thus the Court is without subject matter jurisdiction.  [CR-15 Doc. 79 at 5; CR-15 Doc. 81 at 4-5 ("the government

has failed to produce sufficient evidence to link such acts as an ongoing 'inter-state' conspiracy that would give rise to federal jurisdiction")]; [CR-16 Doc. 77 at 4; CR-16 Doc. 78 at 6-7; CR-16 Doc. 86 at 5 (same rationale)]. Without any interstate nexus, the defendants argue, the Court must dismiss these charges. This argument by the defendants requires little discussion.

As relevant here, the grand jury charged the CR-15 defendants in object one of Count One with conspiring

> to knowingly sell, acquire, receive, and transport wildlife that is, American black bear, with a market value in excess of $350, by providing guiding services for money and other consideration, knowing the wildlife to have been taken, possessed, transported, and sold in violation of and in a manner unlawful [under federal and state law].

[CR-15 Doc. 1 at 2]. Likewise, in Count Two of CR-15 Indictment, the grand jury alleged as a substantive offense that the defendants

> did knowingly sell, acquire, receive, and transport wildlife that is, American black bear, with a market value in excess of $350, by providing guiding services for money and other consideration, knowing the wildlife to have been taken, possessed, transported, and sold in violation of and in a manner unlawful [under federal and state law].

[CR-15 Doc. 1 at 5]. The gravamen of these two charges is the commission of State offenses on lands over which the federal government has jurisdiction.[39] With regard to both of these charges, therefore, the

---

[39] The Court's analysis resolving this first Lacey Act issue in CR-15 applies equally to

Government need not show any affect upon interstate or foreign commerce – legislative authority over the land in question by the federal government provides the basis for jurisdiction.

The statutory provision at issue, 16 U.S.C. § 3372(a)(1), makes it unlawful for any "person" to "sell" "wildlife."  A "person" is anyone subject to the jurisdiction of the United States. 16 U.S.C. § 3371(e). "Selling" wildlife includes providing guiding, outfitting, or other services for money or other consideration. 16 U.S.C. § 3372(c)(1)(A). "Wildlife" means any wild animal, alive or dead.  16 U.S.C. § 3371(a).  The grand jury found probable cause to believe the defendants were present on, or conspired with others to be on, federal land and thus were "persons."  Further it found probable cause to believe defendants sold wildlife by providing guiding, outfitting, or other services for money or other consideration with regard to bear hunting. Finally, the grand jury found probable cause to believe defendants' conduct violated 18 U.S.C. § 13, which makes State crimes federal offenses if committed on property subject to federal jurisdiction, here the taking of wildlife in the NNF contrary to North Carolina law because the bear taken was under the State's legal weight limit.   No failure of subject matter

the defendants' alleged commission of State offenses on lands over which the federal government has jurisdiction as set forth in Counts One through Six in the Indictment filed in CR-16.  For the sake of brevity, the Court will not repeat its analysis as it pertains to the facts alleged in the CR-16 Indictment since the grand jury alleged there only violations of 16 U.S.C. § 3372(a)(1) and no violations of 16 U.S.C. § 3372(a)(2).

jurisdiction is present under the first object of the conspiracy alleged in Count One or under the substantive offense alleged in Count Two.

As relevant to the second object of the conspiracy alleged in Count One of the CR-15 Indictment, the grand jury charged the defendants with conspiring

> to knowingly sell, acquire, receive, **and transport in interstate commerce** wildlife with a market value in excess of $350, that is, American black bear, which the defendants knew was taken, possessed, sold and transported in violation of

State law. [CR-15 Doc. 1 at 2 (emphasis added)]. The federal basis for jurisdiction on this count is that the wildlife, taken illegally under State law, was thereafter transported in interstate commerce.

The statutory provision at issue here, 16 U.S.C. § 3372(a)(2)(A), contains as a necessary element some affect upon interstate commerce. The grand jury found probable cause to believe that the defendants knew that their customer was from North Carolina, that he possessed only a North Carolina hunting license and thus violated Georgia law when he killed a bear that State, and that he would be returning to North Carolina with the products of the bear he had killed in Georgia. Such allegations, if proven by the Government beyond a reasonable doubt, satisfy § 3372(a)(2)'s "in interstate or foreign commerce" requirement because the

harvested game crossed state lines.  Accordingly, the defendants' second jurisdictional contention is without merit.

## III.   Entrapment

As another pretrial argument, four defendants assert that they were entrapped by the law enforcement officers conducting the investigation in this matter.   [CR-15 Docs. 92, 93; CR-16 Docs. 98, 102].

Entrapment is an affirmative defense.   Jacobsen v. United States, 503 U.S. 540, 549 (1992). The defendants herein would be "entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment."   Matthews v. United States, 485 U.S. 58, 62 (1988).  This affirmative defense places upon a defendant the initial burden of presenting evidence that the government "induced" him to commit the alleged crimes.   Jacobsen, 503 U.S. at 549. If a defendant comes forward with such evidence, the burden then shifts to the government to prove beyond a reasonable doubt that the defendant was "predisposed" to commit the alleged crimes.   United States v. Sligh, 142 F.3d 761, 762-63 (4th Cir. 1998).   The affirmative defense of entrapment, if there be any in this case, is factually dependent upon the evidence yet to be introduced at trial.  Accordingly, defendants' motions to dismiss based upon entrapment are premature and will be denied without prejudice.

## IV. Due Process Violation

All five defendants contend that the allegedly wrongful conduct by the officers conducting the investigation in these matters was of such magnitude as to deprive them of their constitutional right to due process. [CR-15 Docs. 92, 93; CR-16 Docs. 98, 102, 104]. A constitutional claim based upon outrageous governmental conduct is necessarily fact-bound. United States v. Russell, 411 U.S. 423, 432 (1973) ("The law enforcement **conduct** here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment.") (emphasis added, citation omitted). At this initial stage of the proceedings, no evidence has been introduced before the trier of fact concerning the conduct of any defendant or of any governmental agent. Accordingly, the defendants' motions to dismiss based upon outrageous governmental conduct are premature and will be denied without prejudice.

## ORDER

Accordingly, **IT IS, THEREFORE, ORDERED** that the defendants' Motions to Dismiss Indictment for Lack of Subject Matter Jurisdiction [CR-15 Docs. 77, 80; CR-16 Docs. 77, 78, 86, 99, 100, and 103] are **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' Motions to Dismiss for Entrapment; Violation of Due Process [CR-15 Docs. 92, 93; CR-16 Docs. 98, 102, 104] are **DENIED without prejudice.**

**IT IS SO ORDERED.**

Signed: August 1, 2014

Martin Reidinger
United States District Judge