# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### BRYSON CITY DIVISION
### CRIMINAL CASE NO. 2:13-cr-15-MR

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>vs. )<br>)<br>)<br>JERRY FRANCIS PARKER (1) )<br>WALTER HENRY STANCIL (4) )<br>_____ ) | **MEMORANDUM OF<br>DECISION AND ORDER** |

**THIS MATTER** is before the Court on the motions for post-verdict acquittal filed by Defendants Jerry Francis Parker and Walter Henry Stancil pursuant to Federal Rule of Criminal Procedure 29.  [Docs. 131 and 132]. The Government has responded to the Defendants' motions. [Doc. 136].

## PROCEDURAL HISTORY

Defendants Jerome Brock Parker, Jerry Francis Parker, Carl Wesley Junaluska II,[1] Walter Henry Stancil, and Walter Cale Stancil,[2] were named in a two-count Indictment returned by the grand jury in this District on June 4, 2013. [Doc. 1].  All five men were charged in Count One with a two-object

_____

[1] Defendant Junaluska was dismissed from this matter November 21, 2013.  [Doc. 73].

[2] Defendant Walter Cale Stancil was dismissed from this matter February 25, 2014.  [Doc. 87].

conspiracy to violate wildlife laws and regulations in derogation of the Lacey Act.[3]  The grand jury alleged that from October 24, 2011, to October 28, 2011, in two separate incidents – one occurring in North Carolina and one occurring in Georgia – the defendants conspired to sell, acquire, receive, and transport American black bear, with a market value in excess of $350, by providing guiding services for money and other consideration, knowing the bear to have been taken, possessed, transported, and sold in violation of state and federal law.  [Id. at 1-5].  Count Two contained a Lacey Act violation and alleged the Parker Defendants should be punished federally, pursuant to 16 U.S.C. § 3372(a)(1), for illegally taking wildlife on federal forest land in violation of North Carolina wildlife laws and regulations as assimilated pursuant to 18 U.S.C. § 13.  [Id. at 5-6].

On December 4, 2013, in nearly identical motions and memoranda, the Parkers[4] moved the Court to dismiss the Indictment filed against them based upon the alleged want of subject matter jurisdiction.  [Docs. 77-81].  The Government responded by filing its Memorandum in Opposition together with exhibits.  [Docs. 82; 83].  The Court heard arguments from counsel for all

---

[3] The Lacey Act, 16 U.S.C. § 3371 et seq., is a collection of statutes that imposes federal penalties for certain violations of state fish and wildlife laws and regulations.  United States v. Dove, 247 F.3d 152, 156 (4th Cir. 2001).

[4] Defendant Walter Henry Stancil did not join in the Parkers' dispositive motions.

parties on March 24, 2014, regarding Defendants' dismissal motions. At the conclusion of the hearing, the Court ordered additional briefing on the issue of the Court's subject matter jurisdiction. On March 28, 2014, Defendant Jerry Parker filed a Motion to Dismiss for Entrapment and Due Process Violations [Doc. 92] and a brief supplementing his Motion to Dismiss for Lack of Jurisdiction. [Doc. 92-1]. On that same day, Defendant Jerome Parker filed a Motion to Dismiss for Entrapment and Due Process Violations [Doc. 93] and a brief supplementing his Motion to Dismiss for Lack of Jurisdiction. [Doc. 94]. The Government responded with separate memoranda filed April 3, 2014, and April 18, 2014. [Docs. 95; 96]. The Court conducted a second hearing on the Defendants' dismissal motions on May 29, 2014.

On August 1, 2014, in accordance with a lengthy Memorandum of Decision, the Court entered an Order denying the Parkers' motions to dismiss for lack of subject matter jurisdiction. United States v. Parker, 36 F.Supp.3d 550 (W.D.N.C. 2014). The Parkers and Walter Henry Stancil proceeded to trial September 3, 2014. Following the close of the evidence, the Court instructed the jury. In particular, and with regard to Count One of the Indictment, [5] the Court charged the jury:

_____

[5] The Indictment contained seven Overt Acts. However, the Government conceded, prior to the Court instructing the jury, that Overt Act number 2 should not be submitted to the jury as a predicate Lacey Act offense. [Cf. Doc. 1 at 2-3; Sept. 5, 2014, Trial Transcript

I will now read Count One of the bill of indictment, the statutes the defendants are charged with violating, and the essential elements of the offense charged in Count One. Keep in mind as I read these instructions that when you go into the jury room, you will have a copy of the indictment so you do not need to try to memorize exactly how the charges are laid.

Count One of the indictment reads as follows:

From on or about October 24, 2011, through on or about October 28, 2011, in Macon County, within the Western District of North Carolina, and Rabun County, within the Northern District of Georgia, and elsewhere, the defendants, JERRY FRANCIS PARKER, JEROME BROCK PARKER, and WALTER HENRY STANCIL, did unlawfully, willfully, knowingly and intentionally combine, conspire, confederate and agree with one another and with others known and unknown to the Grand Jury to knowingly sell, acquire, receive, and transport wildlife that is, American black bear, with a market value in excess of $350, by providing guiding services for money and other consideration, knowing the wildlife to have been taken, possessed, transported, and sold [ ] in [an unlawful manner under state laws and regulations]; and to knowingly sell, acquire, receive, and transport in interstate commerce wildlife with a market value in excess of $350, that is, American black bear, which the defendants knew was taken, possessed, sold and transported [ ] in [an unlawful manner under state laws and regulations.]

OVERT ACTS

1) JERRY FRANCIS PARKER was an owner and operator of War Paint Kennels, a hunting guide service located in Rabun County, Georgia. On or about October 24, 2011, in Rabun County, JERRY FRANCIS PARKER received $1500 in cash to provide a multi-day guided bear hunt to a customer ("the customer") whom he knew to be a North Carolina resident and

_____

at 5-6]. Accordingly, the Court omitted Overt Act number 2 from the jury instructions and renumbered the following Overt Acts for the jury so that there would be no interruption in the numerical sequence.

to be licensed to hunt only in North Carolina. The customer had arranged for this hunting trip through telephone and email communications between himself in the Western District of North Carolina and JERRY FRANCIS PARKER in Georgia.

2) Later in the day on or about October 24, 2011, JEROME BROCK PARKER guided the customer on a bear hunt in Macon County, North Carolina, in the Nantahala National Forest. JEROME BROCK PARKER directed the customer to shoot an American black bear, and the customer did so, killing it. That bear was a juvenile, weighing less than the 50 pounds minimum required by North Carolina law. North Carolina law limits a hunter to taking only one bear per season. JEROME BROCK PARKER informed the customer that he could tag and report the bear, in compliance with state wildlife laws, but that if the customer wanted a bigger bear they could get one. JEROME BROCK PARKER called his father, JERRY FRANCIS PARKER, and explained what had happened, and JERRY FRANCIS PARKER told the customer that it was up to the customer to decide what to do, but if the customer wanted to keep hunting, they could get him another bear. After that conversation, JEROME BROCK PARKER advised the customer to hide the bear carcass in a cave, not report it, and to continue hunting. The customer then hid the carcass in a cave and continued hunting.

3) On or about October 25 and 26, 2011, JERRY FRANCIS PARKER arranged for other persons whose identity is known to the Grand Jury to guide the customer on bear hunts in Macon County, North Carolina, but no bear was taken.

4) On or about October 27, 2011, JERRY FRANCIS PARKER guided the customer on a bear hunt in Macon County, North Carolina, but this hunt was unsuccessful. JERRY FRANCIS PARKER then drove the customer into Rabun County, Georgia, and guided him on a bear hunt there, although he knew the customer did not have a Georgia hunting license. That hunt, too, was unsuccessful.

5) Later on or about October 27, 2011, JERRY FRANCIS PARKER arranged for WALTER HENRY STANCIL to take the

customer on a bear hunt in Rabun County, Georgia. STANCIL took the customer to a location in Rabun County and directed the customer to an area where STANCIL maintained a bait site, using a chocolate product as the bait. Georgia law prohibits the use of any type of bait to concentrate the bear population in any area or to lure them to any location that gives or might give a hunter an unnatural advantage when hunting bear. STANCIL described the various bears that frequented that site and gave the customer instructions on which ones should or should not be shot. Later that day, at that site, the customer shot and killed an adult black bear. WALTER HENRY STANCIL and his adult son, Walter Cale Stancil assisted the customer in transporting the bear carcass to the residence of JERRY FRANCIS PARKER, using Walter Cale Stancil's Toyota truck. JERRY FRANCIS PARKER and the customer processed the bear carcass. PARKER directed the customer to falsely report that the bear had been taken in North Carolina by "punching" his North Carolina license and reporting the kill to North Carolina wildlife authorities within 48 hours.

6) On or about October 28, 2011, the customer transported the skin and meat from the bear from Rabun County, Georgia, into Macon County, North Carolina.

OBJECT OF THE CONSPIRACY

It was the object of the conspiracy that the defendants sell wildlife with a market value in excess of $350, that is, American black bears, by conducting hunting guide services within the Nantahala National Forest in the Western District of North Carolina, and in the Northern District of Georgia, in which the wildlife was taken in violation of applicable federal or state law. All in violation of Title 18, United States Code, Section 371.

[Sept. 5, 2014, Trial Transcript at 108-112].  In addition to instructing the jury

as to the elements pertaining to the felonious conspiracy alleged in Count

One, the Court instructed the jury as to the elements pertaining to the lesser-

included misdemeanor conspiracy subsumed within Count One. [Id. at 119-121].

The jury returned its verdicts as to each Defendant on September 8, 2014. [Doc. 130]. Further, on its Verdict Sheet, the jury made findings on each Overt Act alleged against the three Defendants as well as each Object of the Conspiracy. [Id. at 1-2]. The jury acquitted Defendant Jerome Brock Parker of all charges contained in each Count of the Indictment. [Id. at 4; 7]. The jury acquitted Defendant Jerry Francis Parker of all charges related to the first object of the conspiracy in Count One, the felony charge contained in the second object of the conspiracy in Count One, and the charge contained in Count Two. The jury, however, convicted Defendant Jerry Francis Parker of the misdemeanor charge contained in the second object of the conspiracy in Count One that related to the Georgia wildlife violation. [Id. at 2-6]. As to Defendant Walter Henry Stancil, the jury acquitted him of all charges related to the first object of the conspiracy in Count One and the felony charge contained in the second object of the conspiracy in Count One. But, just as it did with Defendant Jerry Francis Parker, the jury convicted Defendant Walter Henry Stancil only of the misdemeanor charge contained in the second object of the conspiracy in Count One. [Id. at 5]. Defendants

Jerry Francis Parker and Walter Henry Stancil thereafter filed their motions for post-verdict acquittal.

## FACTUAL BACKGROUND

Relevant to Defendants' motions, the evidence taken in the light most favorable to the Government disclosed the following. A North Carolina Wildlife Resources Commission Officer, Chad Arnold, as a part of a sting operation, assumed the undercover persona of Chad Ryan. [Sept. 3, 2014, Trial Transcript at 61]. In the early fall of 2011, Arnold, posing as Ryan, called Defendant Jerry Francis Parker at his place of business, War Paint Kennels in Rabun County, Georgia, to arrange hunting/guiding services. [Id.]. Arnold told Parker[6] that he was from Charlotte and that "a friend" had recommended Parker as a hunting guide. [Id. at 62]. Through a series of telephone calls, Parker told Arnold he and his outfitters would guide Arnold on a bear hunt beginning October 24, 2011. [Id. at 63-66]. In a call Arnold placed to Parker on September 28, 2011, Arnold advised Parker that he possessed a North Carolina hunting license. [Gov. Trial Ex. 11]. Ultimately, the fee Parker quoted Arnold for his services would be $1,500 and Parker

---

[6] Unless otherwise indicated, for the remainder of this Order the Court will refer to Defendant Jerry Francis Parker as "Parker" and Defendant Walter Henry Stancil as "Stancil."

guaranteed Arnold "a hundred percent" likelihood that Arnold would take a bear.  [Sept. 3, 2014, Trial Transcript at 67].

On October 24, 2011, Arnold drove to Parker's War Paint Kennels establishment in Rabun County, Georgia, arriving at approximately 6:30 a.m. [Sept. 3, 2014, Trial Transcript at 75].  Upon Arnold's arrival, Parker met him and received from Arnold a $1,500 cash payment to secure Parker's services for a five-day hunt.  [Id.].   Beginning that day, Parker, and others working with Parker (both indicted and unindicted), guided Arnold for several days of hunting.  During the first day of the hunt, Arnold shot and killed an undersized juvenile bear.  [Id. at 103-110].   It was this incident that formed the basis for the grand jury's charge alleging the North Carolina wildlife violation contained in the first object of the conspiracy in Count One and the charge in Count Two.  [Doc. 1 at 1-6].  The Defendants were acquitted of those charges.

Also on his first hunting day, Arnold saw and met Stancil on two occasions, once in the morning, and then later in the afternoon after he killed the undersized bear.  [Sept. 3, 2014, Trial Transcript at 112-13; 116-18]. Arnold finished his first day of hunting with Stancil at approximately 9:20 p.m. that evening without taking any other game.  [Id. at 118].   Arnold continued

hunting with Parker, Stancil and others on October 25, and 26, 2011, but was not successful in killing any bears on either of those days. [Id. at 128-38].

On the fourth day of his hunt, October 27, 2011, Parker guided Arnold from approximately 6:30 a.m. until late in the afternoon. [Id. at 138-162]. The men were unsuccessful in taking any game and returned to Parker's business. [Id.]. Upon returning, Parker approached Arnold and asked him if wanted to kill a bear that afternoon. [Id. at 163]. Parker continued by telling Arnold that he knew someone who had a bear in his "cornfield" and that Arnold should give this person a call. [Id.]. Arnold asked if the person was Walt Stancil and Parker replied in the affirmative saying Arnold should "call Walt." [Id.]. Parker then cautioned Arnold: "You can kill them [bear] in Georgia legal right now with a gun. You ain't supposed to hunt over bait, though. Ain't nobody knows that. And I'll tag it for you or whatever." Gov. Trial Ex. 15b. Arnold then called Stancil using a telephone number provided by Parker. [Id. at 166]. Stancil told Arnold that if he wanted to kill a bear, he needed to come over to Stancil's house right away. Further, Stancil told Arnold to bring a flash light "cause you'll sit until dark." [Id.]. Arnold loaded his gear into his pickup truck and drove to Stancil's home. [Id.].

At Stancil's house, Stancil met Arnold and told him to transfer his gear to Stancil's truck. [Id. at 169]. Stancil then drove Arnold "to Blue Ridge Road

which is not too far from his residence. Traveled up Blue Ridge Road and then came to a metal building on the left-hand side of the road." [Id.]. Stancil let Arnold out of his truck and instructed him to walk up past the metal building until he came to a large white oak tree with a platform attached to it and a 55 gallon drum or barrel on the platform. [Id.]. There at that tree, Stancil said, Arnold would later see two bear cubs arrive together with a sow to visit the platform. [Id.]. Stancil told Arnold not to shoot the cubs or their mother but to wait awhile longer as an adult male bear would visit the platform after the other bears left. [Id. at 170]. Arnold walked up past a metal building, found the tree with the platform Stancil had described, and secreted himself about 50 yards away from the tree and began to wait. [Id. at 173].

As Stancil had predicted, two juvenile bears appeared first. They went to the platform and began eating some of the contents of the barrel. [Id.]. Within a few minutes, a larger bear, one Arnold understood to be the cubs' mother, arrived at the platform tree as well. According to Arnold's testimony, the sow came within 15 yards of where he was hiding, caught Arnold's scent from a change in the wind direction, "and took off running. When it did, the two cubs jumped off the platform and followed." [Id.]. Arnold stayed put and continued to wait. After some time passed, another bear came alone to the

platform. "It came from the right-hand side of the platform. It came to the white oak tree and turned and looked at me." [Id.]. Once the bear looked at Arnold, Arnold shouldered his rifle and shot the bear, striking it in the left shoulder. [Id.]. The bear left the platform tree area and returned to the woods. Arnold waited about 15 minutes until he "heard something crash" and then began tracking the bear believing it to have died. [Id. at 174].

Arnold was able to follow the bear's blood trail for a short while but lost it, in large measure, because it had become dark by that time. [Id. at 175]. Arnold called Stancil and told him he had shot a bear and asked for Stancil's assistance it trying to find it. [Id.]. While Arnold was waiting for Stancil to arrive, he went over to the platform tree to investigate what the cubs had eaten from inside the barrel. [Id. at 182]. What Arnold found in the drum was crushed candy that he testified to be bits of M&Ms and "chocolate waste." [Id.]. Stancil arrived a short time later along with his son, Walter Cale Stancil (Cale). [Id. at 175]. Arnold showed Cale where he had lost the bear's blood trial and Cale quickly located the carcass. [Id.].

Arnold dragged the bear carcass into the pathway where the bear had emerged from the woods. [Id. at 189]. In the meantime, Cale walked to his pickup truck and then drove it back to where Arnold was located with the bear. [Id.]. Arnold and both Stancils then loaded the bear carcass into the

truck and drove away from the platform tree. While driving away, Stancil asked Arnold if he had called Parker to tell him about taking the bear. Arnold replied that he had not called Parker because he was preoccupied with first finding the bear carcass. Stancil suggested Arnold call Parker and then "get ready to skin." [Id. at 190].

The three men first drove to Stancil's home so that Arnold could retrieve his vehicle and then Arnold followed the Stancils to Parker's business. [Id. at 193]. After arriving at Parker's shop, the men unloaded the bear and then Parker and Stancil conversed about how good the bear's coat looked, Parker commenting that the bear's coat should look good considering the thousands of dollars' worth of bait the bear had eaten. [Id. at 194]. The Stancils then went home and Parker and Arnold spent the next thirty minutes skinning the bear and quartering its meat. [Id. at 196]. After skinning the bear, Parker left Arnold to clean up. Arnold then hung the bear skin and placed the meat in Parker's cooler before going to bed in Parker's bunkhouse. [Id. at 199]. The following morning, Arnold awoke, gathered up his belongings, and drove his truck to the cooler where the bear meat was located and the skin was hanging. He loaded the bear meat and hide into his truck and then drove back to North Carolina without seeing Parker that day. [Id. at 201].

13

On the facts recited above together with other evidence admitted at trial, the jury convicted the Defendants of a misdemeanor conspiracy offense subsumed within the second felonious object of the conspiracy alleged in Count One. The jury specifically found that the Government had proved beyond a reasonable doubt that second Object, namely that the Defendants conspired to commit a Lacey Act violation in the State of Georgia. [Doc. 130 at 2]. The Court instructed the jury on the elements of this offense as follows:

> In order to establish another object of the conspiracy, a misdemeanor violation of the Lacey Act in Georgia, the government must prove each of the following essential elements beyond a reasonable doubt:
>
> 1.   A member of the conspiracy, in the exercise of due care, should have known that wildlife had been taken by a hunter in violation of or in a manner unlawful under Georgia law or regulation;
>
> 2.   A member of the conspiracy, for money or other valuable consideration, provided guiding, outfitting, or other services to the hunter who such conspirator, in the exercise of due care, should have known had taken wildlife in violation of or in a manner unlawful under any Georgia law or regulation; and
>
> 3.   A member of the conspiracy knew that the hunter who had unlawfully taken the wildlife, transported, intended to transport, or attempted to transport such wildlife in interstate or foreign commerce.
>
> * * * * * * * * * * * *
>
> Members of the jury, I charge you that Georgia law requires hunters to follow certain rules and regulations in that State. In particular, the Georgia statutes and regulations require any

individual who wishes to participate in hunting activities to obtain and possess a valid hunting license issued by the State of Georgia before engaging in any hunting activity. Also, Georgia laws and regulations prohibit the use of any type of bait to concentrate the bear population in any area or to lure them to any location that gives or might give a hunter an unnatural advantage when hunting bear.

[Sept. 5, 2014, Trial Transcript at 121-122].    The jury also specifically found the Government had proved beyond a reasonable doubt two Overt Acts in furtherance of this misdemeanor conspiracy, Overt Acts number 3 and number 6. [Doc. 130 at 1].    These Overt Acts asserted:

3) On or about October 25 and 26, 2011, JERRY FRANCIS PARKER arranged for other persons whose identity is known to the Grand Jury to guide the customer on bear hunts in Macon County, North Carolina, but no bear was taken.

* * * * * * * * *

6) On or about October 28, 2011, the customer transported the skin and meat from the bear from Rabun County, Georgia, into Macon County, North Carolina.

[Sept. 5, 2014, Trial Transcript at 111-112].

## STANDARD OF REVIEW

When confronted with a post-verdict motion for judgment of acquittal, the Court must assess whether, taking the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. See United States v. Higgs, 353 F.3d 281, 313 (4th Cir. 2003) (holding that a

conviction must be sustained if there is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt") (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). The Court does not weigh the credibility of witnesses but must accept any such determinations made by the jury which are necessarily resolved by the verdict. See United States v. Wilson, 118 F.3d 228, 234 (4th Cir. 1997) (holding that credibility determinations are reserved for the jury, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe) (internal quotation marks omitted); United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983).

## DISCUSSION

The Defendants argue, in identical Rule 29 motions, that the Court should acquit each of them of the misdemeanor Lacey Act conspiracy violation for which the jury returned verdicts of guilty against them both. [Doc. 130]. In support of their argument, the Defendants assert first that their convictions are inconsistent with the jury's Overt Act findings. [Docs. 131 at 4; 132 at 4]. Second, the Defendants assert that the Government engaged in unlawful overreaching because the undercover agent "was an active participant in the creation of the crime[.]" [Docs. 131 at 9; 132 at 7]. Finally,

Defendant Stancil alone argues insufficient evidence exists to warrant a conclusion beyond a reasonable doubt that the bait stand where the undercover agent killed the adult bear was located in Georgia. [Doc. 132 at 12].

I.    The Jury's Alleged Inconsistent Verdict.

In their first argument for acquittal, the Defendants contend that the jury's verdict finding them guilty of the misdemeanor conspiracy Lacey Act violation was inconsistent with its Overt Act findings entered on the verdict sheet.

At the outset, it must be noted that Defendants' argument does not support their motions. They have moved for a judgment of acquittal pursuant to Rule 29.  A motion made thereunder is a test of the sufficiency of the Government's evidence.  The jury's findings, other than it having found the Defendants guilty of one count each, is irrelevant to the question of the sufficiency of the evidence to support those two convictions.  Nevertheless, Defendants' maintain that they should be acquitted because they claim the jury's verdict is inconsistent with conviction.  Not surprisingly, the Defendants cite no authority for their novel position.  An inconsistent verdict is no basis for overturning a guilty verdict.  See, United States v. Powell, 469 U.S. 57, 69 (1984) (acquittal on charges of conspiracy to possess cocaine and

possession of cocaine did not require that convictions of using telephone to facilitate those offenses be vacated on ground of inconsistency of verdicts); Dunn v. United States, 284 U.S. 390, 393 (1932) (defendant could be convicted of maintaining a common nuisance by keeping intoxicating liquor for sale at a specified place even though a jury found the defendant not guilty of unlawful possession of intoxicating liquor and unlawful sale of such liquor). This is true even in the situation where a defendant is convicted of conspiracy but his only alleged co-conspirator is acquitted. United States v. Thomas, 900 F.2d 37, 40 (4th Cir. 1990).

Moreover, there exists no inconsistency in the jury's verdict. The Defendants claim, as the tenet of their inconsistency argument, that the Government's failure of proof beyond a reasonable doubt regarding the four "unproven" Overt Acts constituted the jury's affirmative finding that all factual assertions contained therein must be taken as disproved. See, e.g., Defendants' Motions ("The jury found that Jerry Parker was not a guide under Overt Act Number 1 and that he did not provide a guiding service as alleged in the Overt Act for a multi-day guided bear hunt to a customer and that he knew to be a North Carolina resident and that he arranged communication for that hunt in the State of Georgia."). [Docs. 131 at 4; 132 at 4]. Defendants' position is unsupported by logic. Some of the Overt Acts alleged in the

Indictment were lengthy and consisted of multiple factual assertions. If the jurors found even one assertion of fact to be reasonably doubtful, they would properly find the entirety of the Overt Act then under consideration to be unproven. It does not flow therefrom, however, that all of the factual assertions in each of the four unproven Overt Acts were categorically false. "Acquittal does not have the effect of conclusively establishing the untruth of all the evidence introduced against the defendant." United States v. Bernard, 757 F.2d 1439, 1444 (4th Cir. 1985) (quoting with approval United States v. Sweig, 454 F.2d 181, 184 (2d Cir. 1972). As explained by the Fourth Circuit,

> Even where guilt or acquittal turns on the jury's resolution of one element of the crime, it does not necessarily follow that the jury, as a whole, based the acquittal on a factual finding. A verdict of acquittal demonstrates only a lack of proof beyond a reasonable doubt; it does not necessarily establish the defendant's innocence.

United State v. Isom, 886 F.2d 736, 738 (4th Cir. 1989). Such is the case with the jury's verdict acquitting these Defendants of the felony conspiracy but convicting them of the misdemeanor.

As is relevant here, the Defendants were indicted for participating in a *felonious* conspiracy to violate the Lacey Act. [Doc.1 ]. Defendants were convicted of the lesser included misdemeanor conspiracy offense. The difference between the two offenses is determined primarily by whether the conspirators actually knew or rather reasonably should have known of the

19

hunter's (Arnold's) violation of wildlife regulations.  <u>Cf.</u> 16 U.S.C. § 3373(d)(1)

<u>with</u> 16 U.S.C. § 3373(d)(2).  In short, if conspirators *know* a hunter takes

wildlife illegally and they nevertheless agree to provide guiding services to

the hunter, they are guilty of the greater offense.  If, however, the

conspirators agree to provide guiding services to a hunter but are *recklessly*

*indifferent* to the hunter's illegal taking of wildlife, they are guilty of the lesser

crime.  The jury instructions given by the Court at the Defendants' trial

without any objection illustrate this point:

| FELONY LACEY ACT VIOLATION IN GEORGIA | MISDEMEANOR LACEY ACT VIOLATION IN GEORGIA |
|---|---|
| In order to establish another object of the conspiracy, a violation of the Lacey Act in Georgia, the government must prove each of the following essential elements beyond a reasonable doubt:<br><br>1.  A member of the conspiracy **knew** that wildlife had been taken by a hunter in violation of or in a manner unlawful under Georgia law or regulation;<br>2.  The market value of the wildlife taken exceeded $350.00;<br>3.  A member of the conspiracy, for money or other valuable consideration, **knowingly** provided guiding, outfitting, or other services to the hunter **knowing** such hunter had taken the wildlife in violation of | In order to establish another object of the conspiracy, a misdemeanor violation of the Lacey Act in Georgia, the government must prove each of the following essential elements beyond a reasonable doubt:<br>1.  A member of the conspiracy, in the exercise of due care, **should have known** that wildlife had been taken by a hunter in violation of or in a manner unlawful under Georgia law or regulation;<br>2.  A member of the conspiracy, for money or other valuable consideration, provided guiding, outfitting, or other services to the hunter who such conspirator, in the exercise of due care, **should have known** had taken wildlife in violation |

| | |
|---|---|
| or in a manner unlawful under any Georgia law or regulation; and<br><br>   4.  A member of the conspiracy knew that the hunter who had unlawfully taken the wildlife, transported or intended to transport such wildlife in interstate or foreign commerce. | of or in a manner unlawful under any Georgia law or regulation; and<br><br>   3.  A member of the conspiracy knew that the hunter who had unlawfully taken the wildlife, transported, intended to transport, or attempted to transport such wildlife in interstate or foreign commerce. |

[Sept. 5, 2014, Trial Transcript at 118-121 (emphasis added)].

The Defendants' argument fails to recognize that the grand jury returned an Indictment setting forth only overt acts laden with felonious-intent language. This same language from the Indictment was incorporated into the Court's jury charge when the Court recounted to the petit jury the Overt Acts as alleged by the grand jury. For example, Overt Act number 1 of the Indictment, as read to the jury, stated:

> Overt acts. One, Jerry Francis Parker was an owner and operator of War Paint Kennels, a hunting guide service located in Rabun County, Georgia. On or about October 24, 2011, in Rabun County, Jerry Francis Parker received $1500 in cash to provide a multi-day guided bear hunt to a customer -- <u>the customer to whom he knew to be a North Carolina resident and to be licensed to hunt only in North Carolina</u>. …

[Doc. 1 at 2; Sept. 5, 2014, Trial Transcript at 109 (emphasis added)]. When asked on the verdict sheet whether the Government had proven Overt Act Number 1 beyond a reasonable doubt, and jury answered "No." [Doc. 130 at 1]. The jury's negative answer, however, was not a proclamation that none

21

of the events recited in Overt Act 1 ever occurred.  Instead, and in the light

most favorable to the Government, it was simply an acknowledgment that

the jury maintained a reasonable doubt as to some aspect of that Overt Act.

The jury's negative answer to Overt Act 1 can easily be reconciled with its

verdict of guilty as to the misdemeanor conspiracy violation of the Lacey Act

if, for instance, the jury was doubtful as to whether Parker knew in fact (rather

than in the exercise of due care should have known) the "customer" was not

licensed to hunt in Georgia and therefore had taken the bear there illegally.

The same logic holds true regarding Overt Act 5.

Overt Act number 5 of the Indictment, as read to the jury, stated:

Five. Later on or about October 27, 2011, Jerry Francis Parker
arranged for Walter Henry Stancil to take the customer on a bear
hunt in Rabun County Georgia. Stancil took the customer to a
location in Rabun County and directed the customer to an area
where Stancil maintained a bait site using chocolate product as
bait. Georgia law prohibits the use of any type of bait to
concentrate bear population in an area or to lure them to any
location that gives or might give a hunter an unnatural advantage
when hunting bear. Stancil described the various bears that
frequented that site and gave the customer instructions on which
ones should and should not be shot. Later that day after at the
site the customer shot and killed an adult black bear. Walter
Henry Stancil and his adult son Walter Cale Stancil assisted the
customer in transporting the bear carcass to the residence of
Jerry Francis Parker using Walter Cale Stancil's truck. Jerry
Francis Parker and the customer processed the bear the bear
carcass. Parker directed the customer to falsely report that the
bear had been taken in North Carolina by punching his North
Carolina license and reporting the kill to North Carolina wildlife
authorities within 48 hours.

[Doc. 1 at 3; Sept. 5, 2014, Trial Transcript at 111-12 (emphasis added)].

Here, again, the jury's answer that the Government failed to prove *all* of the assertions contained in Overt Act 5 beyond a reasonable doubt is easily reconcilable with its guilty verdict convicting the Defendants of the misdemeanor offense. Neither Defendant disputes that the "customer" shot an adult black bear over bait at a location directed by Walter Henry Stancil. Likewise, neither Defendant disputes that the Stancils, father and son, drove the "customer" and the bear carcass to Parker's house where Parker helped the "customer" process the bear. In a light most favorable to the Government, though, the jury appears to have been unwilling to impute actual knowledge of the "customer's" unlawful hunting methods to either Defendant. The petit jury may well have done so by rejecting the grand jury's contention, in Overt Act 5, that Defendant Stancil was the person who maintained the illegal bait site. Given all the evidence in the case, the jury's verdict represents its conclusion that Defendants, in the exercise of due care, *should have known* that the "customer" had taken the adult black bear in violation of or in a manner unlawful under Georgia law or regulation.

The Defendants assert that they are entitled to acquittal because of an inconsistency in the jury's verdict. For the reasons stated, however, there is no such inconsistency. Hence, Defendants' argument must fail.

Notwithstanding the failure of the premise underlying the Defendants' Rule 29 motion, that motion brings into question the sufficiency of the Government's evidence to support the jury's verdict. There was substantial evidence to support each element of the charge against both Defendants with regard to the offense of conviction. The evidence showed that following three days of unsuccessful bear hunting, Parker suggested to Arnold that he call Stancil about helping Stancil get rid of a bear from his "cornfield," a none too subtle euphemism for hunting bear at a bait platform known to Stancil. Parker's suggestion that Arnold "call Walt" about this hunting opportunity was every bit as much an act of guiding as Parker physically taking Arnold to some isolated spot in the forest Parker knew from experience was frequented by bears. Stancil, for his part in this operation, knew exactly what Parker meant when he sent Arnold over to his house. Stancil did not take Arnold to any cornfield; he directed him to a bait barrel platform on a white oak tree. Stancil even predicted for Arnold with remarkable accuracy the number, gender, and sequence of bears that would appear at this bait site. After Arnold killed the adult male bear, Parker and Stancil should have known that it had been taken by Arnold in violation of Georgia law because it was taken over bait – the bait to which Arnold had been directed. Further, by helping Arnold skin the bear and quarter its meat, Parker and Stancil

provided guiding, outfitting, or other services to Arnold who they, in the exercise of due care, should have known had taken the bear in violation of Georgia law.

The evidence also shows that the interstate commerce element of this charge was fulfilled, and the jury so found. Overt Act 6, as set forth in the Indictment and read to the jury, stated: "Six. On or about October 28, 2011, the customer transported the skin and meat from the bear from Rabun County, Georgia into Macon County, North Carolina." [Sept. 5, 2014, Trial Transcript at 112]. The jury found the Government had proven this Overt Act beyond a reasonable doubt. [Doc. 130 at 1]. The jury's finding in this regard is significant because Overt Act 6 includes facts necessary to support the third essential element to a finding of guilt for a misdemeanor conspiracy violation of the Lacey Act. To be guilty of the misdemeanor offense, Parker was required to know that Arnold "transported, intended to transport, or attempted to transport" the bear remains in interstate commerce. The jury found, according to its answer regarding Overt Act number 6, that Arnold transported the bear remains in interstate commerce from Georgia to North Carolina. The jury heard uncontested evidence, in the form of Arnold's testimony, that Arnold told Parker he was from Charlotte, North Carolina. In finding the Defendants guilty, therefore, the jury drew the reasonable

inference that Parker knew Arnold "transported, intended to transport, or attempted to transport" the bear remains from Georgia back to North Carolina at the completion of Arnold's hunting excursion. As such, there is clearly substantial evidence in the record that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of the Defendants' guilt beyond a reasonable doubt.

Based upon the foregoing, the Court concludes that the jury's guilty verdict regarding the Defendants' misdemeanor conspiracy violation of the Lacey Act fully comports with its findings on each of the Overt Acts addressed to its consideration. This is so given the <u>mens rea</u> differences Congress ascribed respectively to a felony violation as opposed to a misdemeanor violation of the Lacey Act. Moreover, the jury's convictions of both Defendants was fully supported by the evidence. Accordingly, Defendants' first argument for post-verdict acquittals is denied.

II.    <u>The Government's Alleged Creation of Crime</u>.

As their second argument for acquittal, the Defendants assert that the actions of the Government's lead investigator,

> undercover Agent Arnold, constituted a substantial and material
> pro-active conduct [sic] which gave rise to the criminal charges
> against the Defendant[s] by overt, direct participation by the
> undercover operation [sic] in the killing of the bear in violation of
> Georgia law and the actions of the undercover operative in

transporting the bear across State lines was for the purposes of establishing a Lacey Act violation.

[Docs. 131 at 9; 132 at 7]. In support of their argument that the Government created the crime for which they stand convicted, the Defendants cite to four cases: (1) Sorrells v. United States, 287 U.S. 435 (1932); (2) Sherman v. United States, 356 U.S. 369 (1958); (3) United States v. Stenberg, 803 F.2d 422 (9th Cir. 1986), superseded by statute, Pub.L. 100-653, § 101(3), 102 Stat. 3825 (1988), as recognized in United States v. Atkinson, 966 F.2d 1270, 1273 n.4 (9th Cir. 1992); and (4) United States v. Hudson, 3 F.Supp.3d 772 (C.D. Cal.), rev'd sub nom., United States v. Dunlap, No. 14-50129 (9th Cir. 2014) (unpublished).[7]

The Defendants' argument that the Government created their crime does not espouse a recognized theory for relief. Instead, the Defendants' argument relies upon an amalgamation – a cherry picking – of language taken from their cited court decisions addressing either the affirmative defense of entrapment or the due process violation brought about by governmental overreaching. While both of these principles originated from the Supreme Court's Sorrells decision, their independent evolutionary paths have not been the model of clarity since. In order to address the Defendants'

---

[7] The Court has no occasion to discuss the Hudson case further in this order since the Ninth Circuit reversed that decision.

argument, it is therefore necessary to understand the Sorrells decision and the mischief it unleashed.

C.V. Sorrells was a World War I veteran living in Haywood County, North Carolina, following the war.[8]  Sorrells, 287 U.S. at 439.  In the summer of 1930, Martin, a federal prohibition agent posing as a tourist from Charlotte, was brought to Sorrells' home near Canton by three friends of Sorrells', including Jones.  Both Jones and Sorrells served in the 30th Division of the American Expeditionary Forces during the war and, upon Jones learning that Martin had served in the same Division, thought that Martin should meet Sorrells because of their common bond.  Shortly after arriving at Sorrells' home, the men began recounting their war experiences.  Soon thereafter, Martin asked if Sorrells could get him some liquor.  Sorrells responded that he could not.  Id.  Later during the visit Martin renewed his liquor request a second time without success.  At some point, according to Martin, he asked Sorrells a third time to get him some liquor, "whereupon defendant left his home and after a few minutes came back with a half gallon of liquor for which [Martin] paid the defendant $5."  Id.  Martin testified at trial that he was the "first and only person" of those present at Sorrells' home to say anything

---

[8] The trial in Sorrells was conducted in the same courtroom where the Defendants were tried in the present case.

about procuring liquor and his purpose in doing so was to prosecute Sorrells if he obtained any.  Id. at 440.

Jones was called as a witness at trial on behalf of the defendant.  Jones testified that he introduced Martin to Sorrells because Martin was "an old 30th Division man." Id.  Jones further testified that during the hour to hour and a half visit at Sorrells' home, Martin asked Sorrells "three or four or probably five times to get him some liquor."  Id. Finally, Jones testified that he never knew Sorrells to be in the liquor business and attributed Sorrells' ultimate capitulation to the comradery owed a fellow 30th Division A.E.F. alum.  Id. The prosecution presented no evidence that the defendant had ever possessed or sold any intoxicating liquor prior to the transaction in question.  Id. at 441.   The Government did present evidence that Sorrells made a subsequent sale of liquor to Martin, and also that a search of the defendant's premises two weeks later revealed eleven one-half gallon jars of whisky hidden in a thicket seventy-five yards from the defendant's house, and a ten-gallon keg containing three and a half gallons of wine secreted near his residence.   Sorrells v. United States, 57 F.2d 973, 980 (4th Cir. 1932).

At trial, Sorrells relied upon the defense of entrapment. The district court refused to sustain the defense, denying a motion to direct a verdict in

favor of Sorrells at the close of the prosecution's case, and also refusing to submit the issue of entrapment to the jury.  Sorrells, 287 U.S. at 438.   The jury convicted Sorrells and the Fourth Circuit affirmed his conviction.  Sorrells, 57 F.2d at 978.  The Supreme Court granted its writ of certiorari limited to the question of whether the evidence was sufficient to go to the jury upon the issue of entrapment.   Sorrells, 287 U.S. at 439.

Until granting its writ in Sorrells, the Court had no previous occasion to expound upon "the issue of entrapment" or the contours of its applicability in federal criminal cases.  The Court began by noting that the Fourth Circuit's decision, finding no basis in law to ever support acquittal by entrapment, was "opposed by decisions in all the other circuits" to have addressed the issue and "the Fourth Circuit, in the instant case, was able to reach its conclusion only by declining to follow the rule which it had laid down" in an earlier decision.  Id., 287 U.S. at 443 (citing Newman v. United States, 299 F. 128, 131 (4th Cir. 1924)).

Chief Justice Hughes, writing for five members of the Court, explicitly recognized the defense of entrapment.  Critically, the Court held that the defense exists as a matter of statutory construction and that it was not a constitutional imperative.

> It is manifest that these arguments [about entrapment] rest entirely upon the letter of the statute. They take no account of the

> fact that its application in the circumstances under consideration
> is foreign to its purpose; that such an application is so shocking
> to the sense of justice that it has been urged that it is the duty of
> the court to stop the prosecution in the interest of the government
> itself, to protect it from the illegal conduct of its officers and to
> preserve the purity of its courts. But can an application of the
> statute having such an effect — creating a situation so contrary
> to the purpose of the law and so inconsistent with its proper
> enforcement as to invoke such a challenge — fairly be deemed
> to be within its intendment?

Id. at 446. As defined, entrapment prohibits law enforcement officers from inducing criminal behavior in "otherwise innocent" persons – those not predisposed to acting unlawfully. Id. at 448.

Justice Roberts, writing for three[9] members, concurred in the Court's result recognizing an entrapment defense. In his opinion, however, an entrapment defense based on any statute, silent with regard to affirmative defenses, was a product of flawed logic.

> If we assume the defendant to have been a person of upright
> purposes, law abiding, and not prone to crime — induced against
> his own will and better judgment to become the instrument of the
> criminal purpose of another — his action, so induced, none the
> less falls within the letter of the law and renders him amenable
> to its penalties. Viewed in its true light entrapment is not a
> defense to him; his act, coupled with his intent to do the act,
> brings him within the definition of the law; he has no rights or
> equities by reason of his entrapment. It cannot truly be said that
> entrapment excuses him or contradicts the obvious fact of his
> commission of the offense. We cannot escape this conclusion by

---

[9] Justice McReynolds voted to affirm the Fourth Circuit's decision without opinion. Id., 287 U.S. at 453.

saying that where need arises the statute will be read as containing an implicit condition that it shall not apply in the case of entrapment.

Id. at 456 (Roberts, J., concurring) (internal citation omitted). Justice Roberts believed the proper focal point in analyzing the issue of entrapment was not upon a statute's "intendment" (or a defendant's predilections for that matter), but upon the Constitutional autonomy of the Judicial Branch.[10]   First principles required the courts, in circumstances where the zealousness of law enforcement activity was so shocking to the sense of justice, to stop the prosecution entirely in an effort to protect the purity of government.  Id. at 455 (Roberts, J., concurring).  Because neither civil courts in equity or of law "tolerate the use of their process to consummate a wrong[,]" in Justice Roberts' view "[t]he doctrine of entrapment in criminal law is the analogue of the same rule applied in civil proceedings."  Id.   Consequently, "[p]roof of entrapment, at any stage of the case, requires the court to stop the prosecution, direct that the indictment be quashed, and the defendant set at liberty."  Id. at 457 (Roberts, J., concurring) (footnote omitted).

---

[10] Members of the Court, in subsequent opinions, thus came to refer to the form of entrapment defined by the majority as "subjective" entrapment due to the components of inducement and predisposition.  "Objective" entrapment was that form of entrapment originally described by Justice Roberts which considered the actions of law enforcement when carrying out an investigation.  United States v. Russell, 411 U.S. 423, 440 (1973) (Stewart, J., dissenting); Hampton v. United States, 425 U.S. 484, 496 (1976) (Brennan, J., dissenting).

A quarter century later, the issue of entrapment reappeared before the Court. Sherman v. United States, 356 U.S. 369 (1958). In Sherman, the defendant asked the Court to reverse his conviction asserting he was entrapped as a matter of law. The factual narrative in Sherman followed the same general theme as that contained in Sorrells.

Defendant Sherman met Kalchinian, a government informant and his future nemesis, while the two were recovering drug addicts in rehab. 356 U.S. at 371. After several subsequent meetings, Kalchinian asked Sherman if he knew a good source of illicit drugs because Kalchinian felt he was not responding to treatment. From the beginning of such requests, Sherman attempted to avoid the issue. "Not until after a number of repetitions of the request, predicated on Kalchinian's presumed suffering, did petitioner finally acquiesce." Id. Thereafter, Kalchinian notified law enforcement that he had another "seller" for them to prosecute and participated in an undercover transaction with Sherman witnessed by the officers. Id. Sherman was arrested and brought to trial on narcotics charges. His case was heard by a jury who, following the trial court's instructions, which included an entrapment instruction, convicted him. On appeal, the Second Circuit affirmed. The Supreme Court granted review and reversed Sherman's conviction.

The Court began by noting that <u>Sorrells</u> firmly recognized the defense of entrapment in the federal courts.  <u>Sherman</u>, 356 U.S. at 372.  It reiterated:

> The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, [a] different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute. The stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.

<u>Id.</u> (internal citation and quotation marks omitted).  The Court observed that agents who merely afford defendants an opportunity to commit an offense, however, do not entrap them.  "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in <u>Sorrells</u>."  <u>Id.</u> at 372-73.  Finding as a matter of law that the police laid a trap for the unwary innocent, the Court reversed Sherman's conviction.

In a post-script, the Court remarked that some contention[11] existed for reconsidering the reasoning supporting the majority opinion in <u>Sorrells</u>.

> It has been suggested that in overturning this conviction we should reassess the doctrine of entrapment according to principles announced in the separate opinion of Mr. Justice Roberts in <u>Sorrells</u>[.]  To do so would be to decide the case on grounds rejected by the majority in <u>Sorrells</u> and, so far as the record shows, not raised here or below by the parties before us. We do not ordinarily decide issues not presented by the parties and there is good reason not to vary that practice in this case.

<u>Id.</u> at 376 (internal citation omitted).   Following Justice Roberts' lead, Justice Frankfurter opined that the issue of entrapment was an issue best left for courts, not juries, to address.   "What police conduct is to be condemned, because likely to induce those not otherwise ready and willing to commit crime, must be picked out from case to case as new situations arise involving different crimes and new methods of detection."   <u>Id.</u> at 384 (Frankfurter, J., concurring).    This was so for two reasons.   First, the Judicial Branch possesses the constitutional mandate to preserve "the purity of its own temple[.]"  Second, a jury's verdict finding entrapment resolves just one case and has no precedential value going forward.  Only the courts, "through the

---

[11] It appears that Chief Justice Warren's obscure reference to the person who "suggested" <u>Sorrells</u> be reexamined was his colleague, Justice Frankfurter.   Justice Frankfurter penned a four-member concurring opinion in <u>Sherman</u> arguing vehemently that the Court adopt the reasoning underlying Justice Robert's position in <u>Sorrells</u> regarding entrapment. <u>Sherman</u>, 356 U.S. at 378-385 (Frankfurter, J., concurring).

gradual evolution of explicit standards in accumulated precedents, can do this with the degree of certainty that the wise administration of criminal justice demands." Id. at 385 (Frankfurter, J., concurring).

From the foregoing discussion of the debate dividing the Court over the proper genesis of entrapment, one can see the establishment and refinement of the entrapment defense, as espoused by the majority opinions in Sorrells and Sherman. One can also see the coalescence of a new doctrine emerging from Justice Roberts' concurrence in Sorrells. That new doctrine, grounded in the Due Process clause of the Fifth Amendment, was given the name "overzealous law enforcement" by the Court in United States v. Russell, 411 U.S. 423, 435 (1973), and a similar name, "governmental misconduct," by the Court in Hampton v. United States, 425 U.S. 484, 489 (1976). While not cited by the Defendants in their Rule 29 memoranda, Russell and Hampton represent some of the Court's more recent pronouncements on the issue of entrapment.

Russell, like Sherman, was a drug case. Unlike Mr. Sherman, however, the defendants in Russell were not sympathetic drug addicts in the throes of recovery, they were unabashed manufacturers of "speed" or methamphetamine. 411 U.S. at 425. The process of making that drug, though, depended upon the use of phenyl-2-propanone ("P2P"), a difficult to

obtain precursor chemical. Id. The undercover agent enlisted to investigate the case made contact with the defendants, and upon gaining their confidence, proposed that he would supply them with P2P in return for one half of the final product made with it. Id. The defendants accepted this arrangement which led to one batch of methamphetamine being produced. Id. at 426. When the undercover agent returned the following month to pursue their "business arrangement," he was told that the defendants were still interested but that they had obtained two bottles of P2P from another source and would not be finished using them for a couple days. Id. The agent returned three days later with a search warrant and seized drug making equipment and arrested the defendants. Id. Russell proceeded to trial, received an entrapment jury instruction, and was convicted. Id.

On appeal to the Ninth Circuit, Russell conceded that the jury could have believed he was predisposed to commit the charged crimes. However, he argued he was entrapped as a matter of law because, but for the agent providing the scarce and necessary P2P, he would have been unable to have manufactured the drug. Id. at 427. The appellate court agreed, and in so doing, according to the Supreme Court, "expanded the traditional notion of entrapment, which focuses on the predisposition of the defendant, to mandate dismissal of a criminal prosecution whenever the court determines

that there has been an intolerable degree of governmental participation in the criminal enterprise." Id. (internal quotations omitted).

In a 5-4 decision, the Court reversed the Ninth Circuit's opinion in Russell and reaffirmed the traditional entrapment defense as espoused in the majority opinions in Sorrells and Sherman.  Id. at 436.  Along the way, however, the Court made a significant concession: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed."  Id. at 431-32 (internal citation omitted). It is in this way that the doctrine of "overzealous law enforcement," first described by Justice Roberts' concurring opinion in Sorrells, was identified as a potential defense in its own right.

Not long after deciding Russell the Court confronted a case directly raising the issue of "overzealous law enforcement."  In Hampton v. United States, 425 U.S. 484 (1976), the defendant was convicted of heroin distribution.  The defendant claimed the government engaged in unconstitutional overreaching when an acquaintance of the defendant (who was a government informant) sold the defendant some heroin which the defendant in turn resold to undercover officers.  "The Government [was]

doing nothing less than buying contraband from itself through an intermediary and jailing the intermediary." 425 U.S. at 498 (Brennan, J., dissenting). Although the defendant's conviction was affirmed, the case produced a 3-2-3 plurality of opinions.[12] Justice Rehnquist, joined by two other members, concluded that where government agents, a government informant, and the defendant act in concert with one another, and the defendant concedes a predisposition to commit the crime in question, both the defense of entrapment and the defense of governmental overreaching are unavailable and a defendant's conviction must be affirmed. 425 U.S. at 485-491. Justice Powell, joined by Justice Blackmun, concluded that Hampton's conviction must be affirmed based upon the Court's rationale in Russell but that a defendant's predisposition to commit a crime does not foreclose reliance on due process principles or on the Court's supervisory power to bar his conviction. 425 U.S. at 491-496. Dissenting, Justice Brennan, joined by two other members, reaffirmed his commitment to Justice Stewart's dissent in Russell (which he had joined originally), and Justice Frankfurter's concurrence in Sherman (which he had joined originally), and expressed his full agreement with the view of Justice Roberts' concurrence

---

[12] Justice Stevens took no part in the consideration or decision of the case. 425 U.S. at 491.

in <u>Sorrells</u>.  425 U.S. at 496-500.   As summarized well by the Third Circuit, "[t]he rule that is left by <u>Hampton</u> is that although proof of predisposition to commit the crime will bar application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was 'outrageous.' " <u>United States v. Twigg</u>, 588 F.2d 373, 378-79 (3d Cir. 1978).

In this circuit, following <u>Hampton</u>, "the 'outrageous conduct' doctrine survives in theory, but is highly circumscribed. … [A] due process violation may only be found when the conduct at issue 'is outrageous, not merely offensive.' " <u>United States v. Hasan</u>, 718 F.3d 338, 343 (4th Cir. 2013) (internal citation omitted).  Further, courts in this circuit must maintain a "high shock threshold" and show "reluctance to vacate a conviction based on outrageous government conduct that does not otherwise violate a defendant's rights." <u>Id.</u>   The test to determine if government conduct is so outrageous as to offend due process is whether such conduct is "shocking," or "offensive to traditional notions of fundamental fairness."  <u>Id.</u>

This Court has taken pains to discuss the evolution both of the entrapment defense and of the outrageous conduct defense, and it is against this historical backdrop that the Court must resolve the Defendants' argument for acquittal.   The Defendants argue "[t]he only way the

Government agent could invoke a Lacey Act violation under the circumstances of the Government's case was to have the agent commit the crime of killing the [bear] and transporting it across State lines." [Docs. 131 at 10; 132 at 8]. While never denominated as such, the Defendants' argument raises the constitutional defense of outrageous conduct or governmental overreaching.[13] The Defendants assert that Arnold initiated the offense by contacting Parker posing as a purported hunting customer. They further allege that the undercover agent was not merely an active participant in the offense, he was the instrumental participant in the crime. A necessary component of the crimes at issue was the killing of the bear in an unlawful manner and it was the <u>agent</u> who killed the bear, albeit at a location suggested by Stancil. Finally, they allege the undercover agent actually manufactured the federal component of the offense by transporting the bear's carcass across state lines. [Docs. 131 at 9; 132 at 7].

The Defendants raise a significant point that the evidence presented at trial revealed questionable law enforcement tactics. However, as it pertains to the crime for which they stand convicted (i.e. the Georgia

---

[13] The jury in this case was instructed on entrapment as an affirmative defense as to all of the charges. In rendering their unanimous verdicts, the jurors found that the Defendants were not entrapped – at least not as to their misdemeanor conspiracy convictions arising from the conduct occurring in Georgia. Entrapment, however, might well have been the basis of the acquittals for the offenses arising from the conduct occurring in North Carolina. <u>See</u>, <u>infra</u>, n.14.

misdemeanor), the conduct of the undercover officer did not exceed the "high shock threshold" set by the Fourth Circuit in <u>Hasan</u>. While Arnold did initiate contact with Parker, this was to be expected given the nature of the business under investigation. Defendants operated a hunting guide service led by Parker. Any ordinary person wishing to engage the services of a hunting guide must take the first step of contacting the guide. Thereafter, it is incumbent upon the guide to conduct the hunting expedition in a lawful manner.

The evidence, taken in the light most favorable to the Government, was that as of the fourth day of the guided hunting trip, Arnold had been unable to shoot an adult bear and he sought further opportunities.[14] The Defendants directed him to a bait site where he did, in fact, kill an adult bear. The

---

[14] The grand jury charged the Defendants with a two-object conspiracy. [Doc. 1]. As described above, the first Object of the conspiracy, for which the Defendants were acquitted, alleged a Lacey Act violation in North Carolina. As a part of this investigation, undercover agent Arnold, posing as a customer and patron of the Defendants' hunting guide services, shot and killed a juvenile bear in violation of state and federal wildlife regulations. The activity of law enforcement in this way was indeed outrageous. The agent admitted at trial violating fundamental rules of hunting and sportsmanship when he testified that he shot the undersized bear without knowing anything about the animal other than it was bear. "Q: In other words, you're not supposed to shoot something you can't see or can't tell or can't analyze the totality of what your target is. Isn't that true? A: What we teach is to know your target and what is beyond. Q: And that means by knowing your target you need to know the size of your target. A: That's Correct. … Q: So you shot without verifying your target? A: That is correct." [Sept. 3, 2014, Trial Transcript at 256-57]. While no one outside the jury's deliberative process can ever say for certain what evidence led a jury to convict or to acquit in any given case, it is quite likely the activities of law enforcement played a determinative role in the jury's verdicts of not guilty with regard to the charges arising from the conduct occurring in North Carolina.

Defendants then continued to guide and assist Arnold in the transportation, skinning, and butchering of the bear when they reasonably should have known that Arnold had taken the bear illegally at a bait site.  Though the agent was the one who killed the bear, the Defendants were the ones who guided and assisted their "customer."  As for "creating the federal jurisdiction" by the agent taking the bear remains to North Carolina, this was fully expected by the Defendants because they knew Arnold to be from Charlotte, North Carolina.  Sternberg, cited by the Defendants, is insightful:

> Constitutionally unacceptable conduct includes, but is not limited to, situtations where law enforcement agents employed unwarranted physical or mental coercion, where government agents engineer and direct the criminal enterprise from start to finish, and where the government essentially manufactures new crimes in order to obtain the defendant's conviction[.]  On the other hand, the outrageous conduct defense is generally unavailable where the criminal enterprise was already in progress before the government became involved or where the defendant was involved in a continuing series of similar crimes during the government conduct at issue.

Sternberg, 803 F.2d at 429 (internal citations and quotations omitted).  These facts do not support a claim that the agent's conduct was "shocking," or "offensive to traditional notions of fundamental fairness."  Further, the jury found that these facts did not overcome any absence of predisposition on the part of the Defendants. Accordingly, Defendants' second argument for post-verdict acquittal is denied.

III.    <u>Improper Venue/Lack of Jurisdiction</u>.

As his third argument for acquittal, Stancil asserts "the government failed to prove venue and jurisdiction of the Georgia crime beyond a reasonable doubt."[15]  [Doc. 132 at 12].  Defendant Stancil claims that, aside from evidence of Parker's house and place of business being located in Rabun County, Georgia, "there was no evidence whatsoever concerning which state the 'platform stand' was located in."[16]  [Id.]  The jury concluded otherwise and there exist several examples of evidence in the record that a reasonable finder of fact could accept as adequate and sufficient to support that conclusion.

First, the jury heard testimony from the Arnold that he was in the State of Georgia when he shot the second bear at a location directed by Stancil:

---

[15] Though inartfully articulated, it appears that Stancil's argument here is not related to venue at all; Stancil argues that an element of the crime was not proven.  In order to convict Stancil on the Georgia Lacey Act violation, the Government must prove there was a violation of Georgia wildlife laws.  That could only have occurred if Arnold shot the adult bear within the State of Georgia.  Hence, if there was insufficient evidence on this point, Stancil would be entitled to acquittal pursuant to Rule 29.

[16] Stancil's argument on this point is rather disingenuous.  In denying Stancil's Rule 29 motion made on this point, the Court outlined some evidence from which the jury could find, if it accepted as true, that the bait site was situated in Georgia.  "I believe that on Mr. McLean's cross-examination of Sergeant Arnold, Sergeant Arnold testified that it [killing the bear at the bait site] occurred in Georgia and also Sergeant Arnold testified about the directions he was given to get from Mr. Jerry Parker's bunk house to Mr. Stancil's location. And, taking that evidence in the light most favorable to the Government, that he could not have gone the distance that would be necessary to go into the state of North Carolina." [Sept. 5, 2014, Trial Transcript at 1-2].  That specific evidence is more fully set forth below.

Q: So you were through with Parker. You had paid him. You was going home. He gave you a phone number to call about a bear in a corn field and you called Walt Stancil. Correct?

A: Correct.

. . . . . . . . . . . .

Q: Now, that was – at that point in time where you were having this conversation with this man [Mr. Stancil] you were in the State of Georgia.

A: That's correct.

Q: When you pulled out of Jerry Parker's road did you go anywhere to buy a Georgia hunting license?

A: No.

Q: Did you even tell Jerry Parker that you didn't have a Georgia hunting license?

A: No I did not.

Q: Not one time in four days did you say Jerry, I ain't got no Georgia hunting license did you?

A: No.

. . . . . . . . . . . .

Q: All right. So at that point in time you called this man – I ain't even going to get into what you and him talked about, this Mr. Stancil, but you went over there somewhere with him and did what you and him did. Correct?

A: Correct.

Q: So then you go up this road. Who all went with you?

A: I was by myself.

Q:  By yourself.

A:  Mm-hmm.

Q:  In the State of Georgia. You were in the State of Georgia weren't you?

A: That's correct.

[Sept. 3, 2014, Trial Transcript at 284-85; 287].  In the light most favorable to the Government, a reasonable juror could have found that the officer drove from Parker's bunkhouse to Stancil's property and then to the bait site, all within the State of Georgia.

Second, during the undercover operation, Parker said to the undercover agent: "You can kill them [bear] in Georgia legal right now with a gun. You ain't supposed to hunt over bait, though. Ain't nobody knows that. And I'll tag it for you or whatever."  Gov. Trial Ex. 15b.  A juror could reasonably have concluded from Parker's statement that the adult bear shot at the unlawful bait site by Arnold was thus killed in the State of Georgia. Further, the jury could have drawn the reasonable inference, from Parker's statement "I'll tag it for you or whatever[,]" that Parker would use his Georgia bear hunting license to record the agent's kill since the agent said he had a North Carolina hunting license.

Third, Stancil's counsel elicited testimony from the Government's first witness that Arnold shot the adult bear in Georgia.  During the cross-

46

examination of Georgia Department of Natural Resources Law Enforcement

Officer David Webb, the following questioning occurred:

> Q. Chad Arnold killed a bear in Georgia. Is that correct?
>
> A. As far as I know. Yes, sir.
>
> Q. And you actually took warrants out on Walt Stancil for that is that correct?
>
> A. That is correct sir.
>
> Q. And Walt Stancil was charged in Georgia for basically allowing Chad Arnold to go up to where he had those baits maintained is that correct?
>
> A. That is correct.
>
> Q. And those charges are still pending Georgia is that correct?
>
> A. As far as I know yes, sir.

[Sept. 3, 2014, Trial Transcript at 45-46].

Finally, after the undercover agent and Parker skinned and dismembered the bear, Parker warned the agent not to tell anyone where he had killed the bear upon his return home to North Carolina. Gov. Trial Ex. 19d. This cautionary statement by Parker to Arnold would have been entirely unnecessary had the bear been taken in North Carolina since Arnold told Parker he had a North Carolina hunting license. For all of these reasons, then, Stancil's third argument for post-verdict acquittal is denied.

**ORDER**

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendants' motions for post-verdict acquittal pursuant to Federal Rule of Criminal Procedure 29 [Docs. 131 and 132] are **DENIED**.

**IT IS SO ORDERED.**

Signed: June 3, 2015

Martin Reidinger
United States District Judge